MAYNARD, Assignee, etc., *v.* TILDEN.

(*Circuit Court, S. D. New York.* August 28, 1886.)

1. STATUTE OF LIMITATIONS—ASSIGNEE OF BANKRUPT—ACTION FOR REDEMPTION OF STOCK PLEDGED BY BANKRUPT.
   A pledgee of stock for an admitted debt, and for a debt not then capable of
   being ascertained, the validity of the debt also being admitted, who holds
   simply as a pledgee, not claiming absolute ownership, and who has taken no
   steps to change his equitable to an absolute title, has not the adverse interest
   which the statute requires in order to compel the assignee in bankruptcy of
   the pledgeor to institute a suit within two years from the date of his appointment.

2. EQUITY—PARTIES—AMENDMENT.
   In view of the peculiar features of the case, permission allowed plaintiff to
   amend his bill, and suggestions given as to the persons necessary to be included as parties defendant.

In Equity.

*Francis C. Barlow* and *Charles W. Wetmore,* for plaintiff.

*James C. Carter* and *Frank E. Smith,* for defendant.

SHIPMAN, J. This is a bill in equity against Samuel J. Tilden,
which was originally brought in the name of James M. Wilkinson, as
assignee in bankruptcy of William L. Wetmore. Upon the resignation of said Wilkinson, and the election and qualification of Matthew
H. Maynard in his stead, the latter was admitted to prosecute the
action.

The facts in the case which are found to have been proved, and to
be true, are as follows:

William L. Wetmore, a citizen of the state of Michigan, and residing in
the city of Marquette therein, was adjudicated a bankrupt by the district
court of the United States for the Eastern district of Michigan on July 30,
1877. James M. Wilkinson was elected and confirmed as assignee in bankruptcy of said Wetmore on November 15, 1877, accepted said trust, and immediately thereafter became qualified, and entered upon its duties. This bill
was filed in his name, as assignee, on March 4, 1881. He resigned on September 27, 1882. Matthew H. Maynard was elected and confirmed in his
stead, became qualified, accepted said trust, entered upon its duties, and, by
an order of this court on January 12, 1883, was admitted to prosecute this
action.

Said Wetmore, Wilkinson, and Maynard were, at the commencement of
this suit, ever since have been, and now are, citizens of the state of Michigan, and residents of said city of Marquette. The defendant, Samuel J.

Tilden, was, at the commencement of this suit, a citizen of the state of New York, and a resident of Yonkers, in the Southern district of said state, and continued to be such citizen and resident until his death, which occurred on August 4, 1886. This case was tried on April, 13, 14, 15, and 16, 1886.

In May, 1863, said Wetmore became the lessee, for the term of 20 years from May 20, 1863, of a tract of land of 40 acres, situate in said county of Marquette, and in the iron region of the upper peninsula of Michigan. At this time the tract of land was entirely undeveloped, and was at considerable distance from railroad facilities for transportation, but was supposed to contain iron ore.

The lease gave to the lessee and his assigns the right of mining and removing iron ore which might be found in said premises, of erecting forges and furnaces, and doing all such acts upon the premises as would best facilitate the business of mining ore, or of manufacturing iron, and reserved to the lessee, Mrs. Martha W. Bacon, a yearly rent of 20 cents per ton for each ton of ore mined on said land during said term. An average amount of 5,000 tons per year was to be mined during the term.

In November, 1863, Mr. Wetmore visited New York city, with this lease, for the purpose of inducing some capitalist to embark in the enterprise of mining upon the leased land, and was introduced to Mr. Tilden, who was already interested in mining properties in Michigan, and was possessed both of capital and of knowledge in regard to the business and prospects of iron mining. Mr. Wetmore did not have much capital in money. The negotiations between these two persons resulted in a written agreement, dated November 4, 1863, the body of which was as follows:

"(1) The said Wetmore agrees to assign to the said Tilden a lease of certain mines and mining lands by Martha W. Bacon to the said Wetmore, dated the twentieth of May, 1863, (a copy of which is hereto attached;) such assignment to be made in proper legal form, and to be duly recorded, and the said lease to be valid and effectual, and free from incumbrance or charge, except as contained in said lease, of which a copy is hereto annexed; such assignment, with the original lease, to be made for the following considerations, and subject to the following conditions:

"(2) The said Wetmore shall retain a one-sixth interest in the said lease, and is to receive for the other five-sixths five thousand dollars.

"(3) The said Tilden is to advance, on the draft of the said Wetmore, at one day's sight, two hundred dollars, which is to be faithfully expended by the said Wetmore, or such amount of that sum as may be necessary, in order to prepare the lands described in the said lease for examination by such agent or geologist as the said Tilden shall select, to report upon the quantity and quality of iron ores contained in the said lands, and adapted to be advantageously brought to market.

"(4) In case such examination be made before January 1, 1864, and the report be not satisfactory to the said Tilden, the said advance of two hundred dollars shall be abandoned, and at the election of said Tilden to abandon the purchase.

"(5) In case such examination shall not be made, and a further examination shall be deemed necessary by the said Tilden after January 1, 1864, the said Wetmore shall be at liberty to draw on the said Tilden, in favor of the lessor, for one thousand dollars, to be applied as a payment of the royalty provided by the said lease, and the right to make or renew the examination shall be extended for a reasonable period in the spring season of 1864, not beyond June 1st.

"(6) In case such further examination shall not be made, or the report thereupon shall not be satisfactory to the said Tilden, and the purchase shall be declined by the said Tilden, one-half of said latter advance, or five hundred dollars, shall be refunded by the said Wetmore, and the balance of five hun-

dred dollars shall be abandoned by the said Tilden; but, if the purchase should go into effect, the one thousand dollars shall be refunded out of the earnings of the property.

"(7) The said Wetmore shall immediately execute a proper assignment of the said lease, and deposit the same, with the lease, in the hands of Peter White, of Marquette, subject to the performance of this agreement and as in escrow.

"(8) The said Wetmore shall make such investigations as he shall be able, with a view to obtain further lands containing iron mines, and shall submit all such to the acceptance of the said Tilden without further consideration than is herein contained.

"(9) A majority in interest of the person or persons who shall become interested in the said lease shall decide whether the same be vested in a corporation or not, without prejudice to the right of the said Wetmore to have his proportion of the corporate stock which may be received in consideration of the said lease."

Satisfactory geological examinations were made, and on January 18, 1864. Mr. Tilden wrote Mr. Wetmore: "You may make your plans on the assumption that the transaction is to go on." On January 16, 1864, Mr. Wetmore drew upon Mr. Tilden for the accrued royalty of $1,000, which is referred to in the preceding contract, and made the proper entries in a cash-book which he opened on that day, and in which he gave the enterprise the name of the "New York Iron Mine."

In March, 1864, Mr. Wetmore assigned the lease to Mr. Tilden, who gave the former a written memorandum to that effect, in which he also said that the assignment was to be "without prejudice to the right of the said Wetmore * * * to have delivered to him one-sixth part of all stock which may be issued in consideration of the said lease by any corporation to which I may assign the same."

In April, 1864, Mr. Wetmore, in pursuance of a previous understanding or agreement that he was to take the active charge of mining operations, commenced work, erected buildings, and removed the surface earth. In July, 1864, the mining and sale of ore commenced, and during that summer and fall about 8,000 tons, the products of the mine, were sold for about five dollars per ton. The mining and sale of ore, and the investment in tools, supplies, materials, and buildings continued, until on May 1, 1865, there had been expended about $64,366.86.

During this period, between April, 1864, and May, 1865, as on all occasions thereafter, when financial assistance was needed, Mr. Tilden furnished the funds necessary to carry on the enterprise by the acceptance of time drafts drawn upon him by Mr. Wetmore. Remittances of all receipts were made directly to Mr. Tilden, who was the financial, and Mr. Wetmore the mining, head of the enterprise. During the same period, Mr. Tilden was very desirous of selling a portion of his interest in the mine, as the correspondence between the two owners abundantly shows. Although the pecuniary prospects of the mine were very promising, he did not know that the results would be so exceedingly profitable as they proved to be, and he was anxious that others should share the pecuniary burdens of the investment, which were becoming somewhat weighty.

In 1864 and 1865 negotiations were had with different persons by Mr. Wetmore for the sale of a large interest in the mine, and notably with Mr. S. C. Baldwin. The negotiations with him commenced in March, 1865, and continued until May of that year. It was supposed, both by Mr. Wetmore and Mr. Tilden, that they had resulted favorably, and that Baldwin and his associates were to take a large or a controlling interest in the mine, but for some unknown reason he did not complete his proposed contract, and the sale was not made.

During these negotiations, with a view to have a corporation in existence which should own the property and the lease, and to carry into effect the plan which is suggested in the contract, and to make the sale to Baldwin easily and promptly, Mr. Tilden organized, in the city of New York, on March 29, 1865, a corporation, by the name of the "New York Iron Mine," under the general laws of the state of Michigan, which authorized the formation of mining and manufacturing corporations. Articles of association were executed by Mr. Tilden, James P. Sinnott, and John Rankin, Jr.; as corporators. The capital stock was $250,000, divided into 10,000 shares of $25 each. The term of existence of the corporation was 30 years from March 29, 1865. The stockholders, with their respective amounts of stock, were said in the articles of association to be: S. J. Tilden, 6,000 shares; J. P. Sinnott, 2,000 shares; John Rankin, Jr., 2,000 shares.

The subscriptions of both Sinnott and Rankin were for the benefit of Messrs. Tilden and Wetmore. Sinnott was a young lawyer in Mr. Tilden's office, and Rankin was the clerk of Mr. Tilden. It was said in the articles that no capital had been yet paid in. These articles were filed in the office of the secretary of state of Michigan on March 31, 1865, and in the office of the clerk for Marquette county on April 8, 1865.

The first meeting of the corporation was held at Mr. Tilden's office, in New York city, on May 29, 1865. Messrs. Tilden, Sinnott, Wetmore, J. W. La Cour, and Rankin were elected directors. La Cour was Mr. Tilden's office boy. He, Sinnott, and Rankin were mere nominal directors, without pecuniary interest of any kind in the corporation or its stock.

On June 29, 1865, and before any certificate of stock had been issued, a meeting of the directors of said company was held at the office of Mr. Tilden in New York, and the capital stock was increased to 20,000 shares of $25 each. All the directors were present except Mr. Wetmore. He wanted the increase made, as appears by his letters of April 8, 1865, April 19, 1865, and June 24, 1865. The record of the meeting states that "all the members of the corporation were present in person at this meeting, and the foregoing resolution was by them unanimously approved and ratified, and they hereby sign a written consent thereto on the record of such meeting."

On October 18, 1865, four certificates of the capital stock of said company, in the usual form, for 500 shares each, were issued to and received by said Wetmore. Two certificates of 500 shares each were issued to Sidney Adams, to whom said Wetmore had sold 1,000 shares of stock, and one certificate for 333 shares was issued to Frederick P. Wetmore, to whom said W. L. Wetmore had sold said stock. No certificates were issued to Mr. Tilden until February, 1878.

No subsequent meeting of either stockholders or directors of said company was held until July, 1877, and no subsequent election of directors was held until February 14, 1878. Until July, 1877, the records of the meetings which have been mentioned were not entered in a book, but the only form in which they were preserved was upon two loose sheets of paper, carelessly written, interlined and corrected in pencil. The corporation had no record-book until July, 1877. Although thus carelessly organized and maintained, it was and continued to be a legal and valid corporation under the laws of the state of Michigan.

One important question under the bill of complaint is the relations of the two original joint owners of this mining property to each other, after the formation of this corporation.,

After the business of mining actually commenced, and before the formation of this corporation, Messrs. Tilden and Wetmore were copartners in the business of the New York Mine, and each was entitled

to receive a specified share of the profits, and was liable to pay to the other the same share of the losses. This partnership was not manifested by a written contract, but by the acts of the parties. Mr. Wetmore, although he would not have been able, at that time, to make good pecuniary losses, yet, as he was entitled to receive one-sixth of the profits, he was liable to refund to Mr. Tilden that share of the losses.

Although the original agreement shows that the formation of a corporation was contemplated, and although one was formed, the plaintiff says that it was formed only for a certain purpose, viz., to facilitate the sale to Mr. Baldwin, and to carry the sale into effect, and that, the purpose not having been accomplished, the corporation was permitted to remain as a nominal body, but without actual ownership of property, or any vital connection with the mine or its business, and without any relation to the business or dealings with each other of Messrs. Tilden and Wetmore, who continued to be the sole individual owners of the mine, and to manage it in all respects as they did before, and as partners.

It is true that this corporation was established with a view of selling a part of the mine to Mr. Baldwin, and that, when the plan of sale fell through, the two owners neglected the orderly and customary business methods or forms by which a corporation ordinarily manifests or proves its existence and its title to property. It received neither assignment of the lease, nor bill of sale of any other property. It had in its possession no formal written muniment of title to anything which it owned at the time it commenced business.

Apparently careless as was the manner in which the corporation held the title to and managed the business of the large and profitable property which went under the name of the "New York Iron Mine," it is yet clear that the two owners of the property not only understood that their respective interests had been transferred to and belonged to a corporation bearing that name, having a capital of 20,000 shares, of which Mr. Tilden owned 16,667 shares, and Mr. Wetmore originally owned 3,333 shares, and of which corporation they were the sole managers, but, after the formation, it is manifest that the property of the New York Iron Mine was in fact transferred to the corporation, for these among other reasons:

(1) Mr. Wetmore wrote to Mr. Tilden, on June 23, 1865, as follows: "As to the time when the concern should be turned over to the new concern, I did that on the first May, as my statements of both sets of books will show." This letter was in reply to a letter of Mr. Tilden of June 16, 1865, in which he mentions, as one of the things to be settled, "the time when the old concern shall be turned over to the new."

(2) This turning over of the old concern to the new was effected by causing an inventory to be made of all the property of the partnership at the mine, and by crediting the inventory to the corpora-

tion in its books, and transferring to it all the accounts. There was thus a transfer to the new corporation on its books of the property of the former owners, although there was no bill of sale and no resolution of the board of directors whereby said property was accepted in lieu of cash. The lease, which was not transferred, must have been held by Mr. Tilden as trustee for the corporation.

(3) A controlling fact upon the question now under consideration is the fact that both parties treated their valuable interests in the mine and its business as if they were represented by stock in the new corporation; and bought, sold, and pledged its stock, and virtually represented to each other and to the public that the corporation in whose stock they were then dealing was the owner of the New York Iron Mine.

Mr. Wetmore sold 1,000 shares to Sidney Adams, and 333 shares to his brother, F. P. Wetmore. On April 10, 1866, he bought from Mr. Tilden 3,000 shares for five dollars per share, and pledged the same stock to Mr. Tilden as security for the purchase money. In 1866, Mr. Wetmore bought from Mr. Adams 500 shares of his stock, and sold them to S. P. Ely, who also bought the other 500 shares of the Adams stock. In August, 1868, Mr. Tilden, through Mr. Wetmore, bought from Mr. Ely his 1,000 shares for $12 per share, and in 1872 Mr. Wetmore bought from his brother his 333 shares. In December, 1873, he pledged 1,000 shares of the stock to Peter White as collateral security for a debt of $35,000, and delivered to him the certificates therefor, with an assignment thereof. The transfer was not made upon the books of the company. It is impossible that these sales and purchases should have taken place, and that Messrs. Tilden and Wetmore, who were both buyers and sellers, did not know that the stock represented the property of the New York Iron Mine.

(4) Mr. Wetmore made returns under oath to the authorities of the state of Michigan, which returns were based upon the fact of the existence of the corporation, and its ownership of the property known as the "New York Iron Mine."

(5) The ordinary and daily mining business proceeded upon the idea that it was transacted by a corporation of which Mr. Tilden was president, and George W. Smith was secretary.

The theory that, while all these facts existed, yet that the corporation was a mere name, without property or connection with property, is one which has no force.

After the formation of the corporation, Mr. Tilden acted as its president and treasurer. Remittances were made to him, collections were made by him, and all receipts were deposited by him in his individual bank-account. When the company needed money, he advanced it, and, during the early years of its existence, was sometimes its creditor to the amount of $100,000 or more. Down to and including the year 1871, he charged at the rate of 7 per cent. per annum for the use of money, and gave the company credit at the same

rate for the balance when in its favor. From January 1, 1872, to February 1, 1875, interest was charged on both sides of the account at the rate of 4 per cent. per annum; and from February 1, 1875, to April 1, 1877, at 3 per cent.; and from April 1, 1877, to April 1, 1878, at an average of $2\frac{1}{8}$ per cent. The interest from January 1, 1872, to April 1, 1878, was the same that Mr. Tilden received from the bank on his balances. Mr. Wetmore continued to be the mining head of the company at Marquette, with a mining captain under him. Duplicate sets of books were kept, one at the mine and the other in New York, with the exception that, for a time, the commissions or salary of Mr. Tilden, which had been credited to him on the New York books, as compensation for his services, and which amounted on April 1, 1873, to $35,593.57, did not appear on the Marquette books, because Mr. Wetmore did not recognize the propriety of the credit; but at some time thereafter the two sets of books were made to correspond, by Mr. Wetmore's direction.

No dividends, or division of profits in lieu of dividends, were declared, until June 24, 1872, when a dividend of $6 per share, or $120,000, was made. Thereafter dividends were made as follows: On May 24, 1873, of $7 per share, or $140,000; on May 7, 1874, of $7.50 per share, or $150,000; on May 27, 1875, of $5 per share, or $100,000; on June 3, 1876, of $5 per share, or $100,000; on May 31, 1877, of $12.50 per share, or $250,000. These all amounted to $860,000. Upon each dividend Mr. Tilden received the amount belonging to 14,667 shares. Upon the first dividend W. L. Wetmore received the amount belonging to 5,000 shares, and F. P. Wetmore the amount belonging to 333 shares. Upon all subsequent dividends, Mr. Wetmore's share was computed as that belonging to 5,333 shares, and he received the amounts as hereinafter stated.

These dividends were made at annual interviews between Messrs. Tilden and Wetmore in the city of New York, without the presence or intervention of a board of directors, and were decided upon by the two alone. The decision was practically made by Mr. Tilden, who held the controlling interest in the stock, and the custody of the funds in his individual name. As a rule, Mr. Wetmore wanted a larger sum to be distributed, but Mr. Tilden wished an ample surplus, and a reference to the board would have been a useless waste of time, for Mr. Tilden would have had full control.

At each of these annual meetings, statements of the previous year's business, and of the financial standing of the company, were made out and presented by George W. Smith, the book-keeper of Mr. Tilden, and the secretary of the company. These statements were for the purpose of giving information in regard to the amount of a dividend. They were not annual accountings in the sense that they were a finality or a complete adjustment of the business of the corporation; but they were based upon books which were correctly kept.

The interest which was received by Mr. Tilden on the balance of

the money of the company was apparently correctly accounted for, and was acceded to by Mr. Wetmore. The plaintiff objects to the charges made by Mr. Tilden for commissions or salaries, but upon the argument intentionally left that subject for future discussion, and I therefore make no finding upon it. There was no evidence that Mr. Tilden made use of the company's money in furtherance of his private speculations or investments.

In 1866, Mr. Wetmore became indebted to Mr. Tilden in the sum of $15,000 for the purchase of 3,000 shares of stock, as before stated. The certificates of said stock in the name of Wetmore were assigned by him, and were delivered to Mr. Tilden, with a power of attorney to transfer the same as collateral security, and said stock has ever since remained as a pledge.

This debt, subsequently and before 1871, became $38,000, and 1,000 more shares of stock were transferred by Mr. Wetmore by assignment in blank, and the certificates with a power of attorney to transfer were delivered to Mr. Tilden as additional collateral security. On May 27, 1875, this debt had become $25,000, and was evidenced by a note for that amount, dated May 27, 1875, due May 30, 1876, secured as aforesaid, which was renewed by a note for the same amount, dated May 31, 1876, due May 31, 1877, secured by the continuing pledge of said 4,000 shares; so that when the dividend of June 3, 1876, was made, Wetmore owed Tilden individually $25,000.

Mr. Wetmore had, before June 3, 1876, collected notes belonging to the corporation amounting to $19,806.80, and retained the money. On May 31, 1876, it was agreed between himself and Mr. Tilden, acting for himself and the corporation, that $20,000 of the then accruing dividend of $26,665, to be paid said Wetmore, should be paid in cash, and that $1,750 should be applied in payment of interest on his $25,000 note to Mr. Tilden; and that $4,322.93 should be applied upon his said debt to the corporation, leaving a balance thereon of $15,677.07 unpaid.

For this sum, the company took two notes of Wetmore & Bro., indorsed by F. P. Wetmore and W. L. Wetmore, each dated May 31, 1876, for $10,000, payable, respectively, in seven and ten months from date, upon one of which notes said sum of $4,322.93 was indorsed. For further security, said W. L. Wetmore gave to the corporation his individual note for $15,677.07, pledging, as collateral, said 4,000 shares of his stock, subject to the prior lien to Mr. Tilden. No part of the Wetmore & Bro. notes has been paid by them, or by either of the indorsers.

Mr. Wetmore's statement of his settlement of that dividend is correct, and is as follows:

*"Statement Settlement with S. J. Tilden, and the New York Iron Mine, June 3, 1876.*

I am credited with:

| | | | |
|---|---|---|---|
| Dividend, $5 share, on 5,333 shares stock, | - | - | $26,665 00 |
| By my note, May 31, 1876, 1 year, 7 per cent. interest, | - | | 25,000 00 |
| By note Wetmore & Bro., May 1, 1876, 7 months, | $10,000 00 | | |
| Less indorsed, - - - - - | 4,322 93 | | |
| | | | ·5,677 07 |
| By note Wetmore & Bro., May 1, 1876, 10 months, | - | - | 10,000 00 |
| | | | $67,342 07 |

*Dr.:*

| | | | |
|---|---|---|---|
| To my note due May 30, 1876, | - | - | 25,000 00 |
| To interest on above, - - - - | | | 1,750 00 |
| To money had in fall of 1875, | - | - | 19,806 50 |
| To interest on same to April 1, 1876, - | - | | 548 10 |
| To interest on same from April 1 to June 1, 1876, - | | | 237 47 |
| | | | $47,342 07 |

Due me 3d to draw for, - - · - - - $20,000 00"

Mr. Wetmore was also president of the Munising Iron Company, and was a small stockholder in the Bay Furnace Company, two Michigan corporations for the manufacture of iron. Between September, 1873, and November, 1875, the New York Iron Mine, at his instance, sold iron ore to these two companies, and on May 31, 1876, held notes of the Munising Company to the amount of $43,516.74, and of the Bay Furnace Company amounting to $38,803.42. A large part of these notes were over-due and protested. Mr. Wetmore was liable as an indorser upon $30,000 of the notes of the Munising Company, and upon $21,429.34 of the notes of the Bay Furnace Company. Mr. Tilden was of the opinion that the debts of these two manufacturing companies had been incurred in reliance upon the representations of Mr. Wetmore, and, when the subject of a dividend was reached, insisted that none should be made, unless Mr. Wetmore would assume the payment of said two debts. After an earnest discussion, and a positive one on the part of Mr. Tilden, an agreement to that effect was made, and was embodied in the following portion of the written agreement signed by Mr. Wetmore, dated May 31, 1876, and known as "Exhibit F," and annexed to the plaintiff's bill:

"And I do further agree that the said stock, 4,000 shares, shall and may be held by the said Tilden also for security of all liabilities of the Bay Furnace Company to the New York Iron Mine, and for security of all liabilities of the Munising Iron Company to the New York Iron Mine, which liabilities of both said companies I do hereby assume, and guaranty the payment of; said collaterals to be held for the said liabilities, with the same effect as if they were my own individual and personal liabilities."

The statutes of Michigan give a mining corporation a lien upon the stock of any stockholder in such corporation for the payment of his debts to the corporation.

Exhibit F was not executed as a formal security to evidence advances made to said Wetmore out of his interest in undistributed profits of the said New York Iron Mine. It was not without legal consideration, and was a valid pledge of said 4,000 shares of stock to secure the various debts hereinbefore specified.

On May 31, 1877, the various debts for which said stock was pledged were unpaid, and one year's interest was due thereon. The Munising and Bay Furnace Companies were insolvent, and had suspended business in the fall of 1876. Mr. Wetmore had indorsed for the Bay Furnace Company, had taken its property subject to its mortgages, was manufacturing upon his own account, and had bought from the New York Iron Mine about $22,000 worth of ore to be used in said Furnace. When the sale was reported to Mr. Tilden, he telegraphed that no more should be sold, and demanded security, which was given, for the sale already made.

On May 31, 1877, Messrs. Tilden and Wetmore met in New York to declare a dividend. The latter was in great pecuniary straits, and desired a large dividend. Mr. Tilden refused to make any unless payment of a part of the debts of the Munising and Bay Furnace Companies and payment of Wetmore's debt for ore should be made out of his share. The result of the interview was that Wetmore was obliged to accede, and did accede, to the demands of the other, and delivered to him the following order:

"*To S. J. Tilden, Treasurer of the New York Iron Mine, and to the said Mine:* You will please apply, out of such dividend as may be made on 5,333 shares of the capital stock of the said company belonging to me, seventeen hundred and forty dollars and forty-one cents, ($1,740.41,) being interest on a loan evidenced by my note to S. J. Tilden, due June 1, 1877, for twenty-five thousand dollars, ($25,000,) and a further amount of ten thousand dollars, ($10,000,) on the principal of the said loan, which two sums you will please pay to said Tilden. You will please further, in like manner, apply $772.96 to the payment of a note due May 30, 1877, of W. L. Wetmore. You will also apply $180.27, being the interest on a note of Wetmore & Brother for $10,000, due June 4, 1877, indorsed by me. You will also apply $83.23, being interest due June 1, 1877, on note of Wetmore & Brother, indorsed by me, due April 4, 1877, for $5,875.76, which, with interest on the first of June, amounts to $6,083.23, leaving amount then due $6,000. You will also apply $22,220.05, being the amount due from me for account of ore taken by me from August 1, 1876, to December 1, 1876, and interest on same to June 1, 1877. The balance, being about $31,665.58, you are authorized to apply in such manner and proportions as you may deem expedient, upon any of my liabilities for ore sold to the Bay Furnace, which is computed to amount, on the thirtieth of May, to $42,049.62, and for the Munising Iron Company, which is computed to amount to $47,144.98 on the said thirtieth of May, errors excepted; said last-mentioned sum to be applied in such manner and on such notes as you or your treasurer may deem expedient.

"W. L. WETMORE."

These applications exhausted his share of the dividend of $250,000. At the same time, and as a part of the same agreement, the corporation loaned Wetmore & Bro. $10,000, upon their two notes, each for

$5,000, dated June 1, 1877, one payable in eight and the other in ten months, both indorsed by W. L. Wetmore, who executed the agreement which is annexed to the bill of complaint, and is known as Exhibit E, and which is as follows:

"Whereas, the New York Iron Mine has this day made an advance to Wetmore & Brother at my request, and to me, of the sum of ten thousand dollars, ($10,000,) for which it has received two notes of five thousand ($5,000) dollars each, made by Wetmore & Brother, and indorsed by me, both dated June 1, 1877, one of which is for eight months, the other of which is for ten months, with interest at seven per cent., payable at the Third National Bank, New York: now, therefore, I agree that the said company may hold, as collateral security for the payment of the said notes, all my interest in the said mine, or its property or assets, or in any dividends now or hereafter to be made in the whole or any part of 1,333 shares of the capital stock of the New York Iron Mine, and that S. J. Tilden shall hold four thousand shares of said capital stock as collateral security for the payment of the said notes, subject always to the payment of the loans or advances heretofore made by him on the same, with all the powers and authority in respect thereto which he has or might have for the enforcement of his own advances or loans on the same; and I do further consent and agree with the said mine that the said Tilden may hold the said stock, in like manner, as collateral security for the payment of any and all liabilities of mine to the said company, whether for notes of Wetmore & Brother, or of the Bay Furnace Company, or of the Munising Iron Company, with the same powers and authorities for the enforcement of payment of each and all the said liabilities as were conferred on the said Tilden by the stock-note given for his loan on the said stock; and I do further consent and agree to and with the said New York Iron Mine that all my interest in the said mine, in whatever capacity, and in its assets and property, and all dividends which may now or hereafter be made, shall and may be applied and held for the payment of each and every of the said liabilities; and I do hereby consent and agree that the pig-iron now in hands of Rhodes & Co., assigned by me this day to Tilden, treasurer, may be applied on the unindorsed notes of the Munising Iron Company, or on any of the said notes, or on such of them as the treasurer of the New York Iron Mine may think expedient, and, in case of any surplus, such surplus may be applied on any liabilities of mine to the said New York Iron Mine.                    W. L. WETMORE."
*New York, May* 31, 1877.

This agreement was upon good consideration, and the loans therein mentioned were not advances on account of Wetmore's interest in undistributed profits of the New York Iron Mine. Mr. Tilden, by means of the two papers, compelled the payment of debts to the corporation from a debtor who was deeply involved. Payment was drawn unwillingly from Mr. Wetmore, but the bargain was neither illegal nor invalid. The two papers truly express the reason and purpose for which they were given.

On the day on which these papers were being executed, a forest fire burned up the individual property of Mr. Wetmore in Michigan, who found himself, upon his return to his home, completely insolvent. He had made and negotiated negotiable paper in the name of the New York Iron Mine to the amount of about $60,000, which he had used for his own account. He returned to New York, and informed Mr.

Tilden of this issue, and unavailingly desired him to assume its payment as a part of the debts of the company. Failing to obtain any relief either in this way or by other advances from the company, he filed a voluntary petition in bankruptcy on July 23, 1877.

On July 16, 1877, at a meeting of the directors of the New York Iron Mine, Messrs. Tilden, Sinnott, and Rankin being present, Messrs. La Cour and Rankin tendered their resignations. George W. Smith and William T. Pelton were chosen in their places. Laurence McCloskey was appointed general superintendent of the mine. The previous removal of Mr. Wetmore, as manager at the mine, was confirmed, and the previous dividends were ratified and confirmed. On February 13, 1878, certificates for the 4,000 shares pledged to Mr. Tilden, and for 14,660 of his other shares, were issued to him. At a meeting of the stockholders on February 14, 1878, S. J. Tilden, George W. Smith, Laurence McCloskey, of Michigan, and Charles F. MacLean were elected directors, who subsequently elected Mr. Tilden president and treasurer. On July 1, 1880, at a stockholders' meeting, S. J. Tilden, George W. Smith, Charles J. Canda, Laurence McCloskey, and Charles F. MacLean were elected directors, and were re-elected in October, 1881, at the last stockholders' meeting which has been held. Pelton, Canda, MacLean, McCloskey, Crittenden, Sinnott, and Smith have or have had nominally one share each; but all the certificates, except perhaps Smith's, have been assigned in blank or to Mr. Tilden, and have been delivered to him, or to Mr. Smith for him. Mr. Tilden was also the real owner of said Smith's one share.

The New York Iron Mine made no other dividends. Its bills receivable were collected by Mr. Tilden, and the avails were deposited in bank in his individual name. It continued mining until May 20, 1883, when the lease from Mrs. Bacon expired. Mr. Tilden, on April 1, 1880, obtained a new lease of the same mine from Olive L. Harlow, sole heir of Martha W. Bacon.

In May, 1883, a new corporation was formed, called the "York Mining Company," with a capital of $500,000, divided into 20,000 shares of $25 each, whose business was to be carried on in the same township in which the old corporation was located. The stockholders, and the amounts of their stock, are as follows: Samuel J. Tilden, 15,000 shares; George W. Smith, 4,985 shares; Charles J. Canda, 5 shares; Laurence McCloskey, 5 shares; John J. Cahill, 5 shares. No capital stock was paid in. All the stockholders, except Mr. Tilden, are apparently nominal stockholders only.

The New York Iron Mine had, on May 20, 1883, at the mine, a quantity of ore, and the usual mining plant, consisting of tools, engines, buildings, tenement houses, boarding-houses, stables, and all that pertains to a mine. The property, except that which has been used up, and the ore, is there still. An inventory and appraisal of the plant was made by two mining captains, which has not yet been

accepted as correct either by the New York Iron Mine or the York Mining Company. The latter corporation went into occupancy of the plant, without any previous or subsequent payment to or settlement with its owner for the value of said property, and continued to mine and use said property until May, 1884, when it ceased mining. Nearly all of the ore of the New York Iron Mine has been sold; the personal property at the mine is unsold; some real estate is unsold; but all the other collectible assets, which could be reduced to money, have been converted into cash, and have been deposited in Mr. Tilden's individual bank-account, and the corporation has ceased to do business.

Mr. Wetmore owed Mr. Tilden and the New York Iron Mine, on May 31, 1877, at least the following amounts:

| | |
|---|---:|
| To S. J. Tilden individually, evidenced by note dated May 31, 1877, | $15,000 00 |
| To the New York Iron Mine, as indorser on three notes of Wetmore & Brother, | 26,000 00 |
| Balance of liabilities of Munising Iron Company and Bay Furnace Company, assumed, including interest to May 31, 1877, | 48,383 36 |
| | $89,383 36 |
| Cash in Mr. Wetmore's hands, July 7, 1877, | 2,508 23 |
| Amount of various labor and other accounts, | 7,931 67 |
| Ore purchased individually, | 1,656 44 |
| Amount of draft discounted by Peter White, | 5,000 00 |
| Total, | $106,479 70 |

Suits against the corporation were forthwith commenced by some of the holders of the "irregular paper," which have thus far resulted favorably to the company. Some of these notes have been paid or compromised without suit, upon the ground that the company was legally liable to pay them under the facts which were peculiar to such notes. These payments are held as a debt against said Wetmore, upon the ground that having received the money upon the notes, and used it for his own benefit, he is liable to refund such amount to the company.

Until a recent period it was impossible to know the exact amount of the debt against Wetmore, which might be or become due by reason of this class of paper, and that part of the account is unsettled.

The amont of cash which came into Mr. Tilden's hands for division among the stockholders after May 31, 1877; and which remained in his possession at the time of his death, I cannot accurately estimate. In 1878 he estimated the quick assets, which did not include the real and personal property at the mine, or the value of the lease, at $383,000. The years 1879, 1880, and 1881 were profitable years. The dividends upon Mr. Wetmore's stock, which could be made from the cash in bank, would probably be sufficient to pay all his debts to Mr. Tilden's estate and to the company, and to Mr. White.

After Mr. Wilkinson was appointed assignee, he visited Mr. Tilden in 1878, for the purpose of arriving at some agreement in regard to Mr. Wetmore's interest in the mine. The point under discussion between them was the purchase by Mr. Tilden of Mr. Wetmore's interest in his stock, and a consequent discharge of the liabilities upon it. The only definite agreement on the part of Mr. Tilden was that he would take no steps to sell Mr. Wetmore's stock without giving the assignee ample notice of his intention, so that he could have an opportunity to redeem it.

On May 26, 1881, and after this suit was brought, Mr. Tilden and the corporation advertised for sale at auction, on June 1, 1881, 333 shares of stock in the name of F. P. Wetmore; 1,000 shares in the name of W. L. Wetmore, (but the certificates of which were believed to be in the possession of Peter White,) subject to the lien of Peter White; and 4,000 shares of stock formerly standing in the name of W. L. Wetmore. The sale of the 4,000 shares was said in the advertisement to be by authority conferred by the instruments of May 31, 1876, and May 31, 1877. The sale of the other stock was in pursuance of the authority conferred by the instrument of May 31, 1877, and the sales of all the stocks were to satisfy the then unsatisfied indebtedness mentioned in said respective instruments. A temporary injunction was issued from this court against said sales, which is still in force, and the sales did not take place.

The bill of complaint was framed by the gentleman who was then in charge of the case upon an erroneous theory both in regard to the corporation and the pledges of stock,—a theory which would probably not have been assumed if the pleader had possessed a more accurate knowledge of the facts.

The bill alleges the formation of a copartnership between Mr. Tilden and Mr. Wetmore in November, 1863, to carry on the business of mining iron ore upon the land described in the lease from Mrs. Bacon,—the respective interests of said partners being five-sixths and one-sixth; the assignment of the lease to Mr. Tilden for the purposes of said partnership; the acquisition of profits and of property under said partnership from March 24, 1864, to May 1, 1877. It further alleges an attempt to form a corporation in April, 1865, for the purpose of selling some interest in said property and the filing of articles of association, but that the incorporation was not perfected, and that the business was carried on under the agreement of partnership. The bill, however, alleges that, by mutual agreement of Mr. Tilden and Mr. Wetmore, and for the purpose of distributing evidence of ownership of said property among the parties interested therein, certificates of stock were issued upon a capital of $500,000, divided into 20,000 shares of $25 each, and that such transfers of these certificates took place; that after April 10, 1866, Mr. Wetmore was the owner of 5333-20000 of the mine, and Mr. Tilden was the owner of the residue.

It further alleges that since May 31, 1877, the entire custody of

the property has been in Mr. Tilden, who has carried on the business and realized profits, but has not accounted to the plaintiff. It further alleges that Exhibits E and F were executed; that each of said papers was without consideration; that the loans and advances which they professed to secure were advances made on account of Mr. Wetmore's share in the undistributed profits of the business. The validity of the pledge of 1,333 shares of stock is attacked on the ground of a noncompliance with the provisions of the New York statute of frauds; but this point was abandoned on the argument. The defendant is also charged with threatening to sell the pledged stock to the great damage of the plaintiff.

The prayer of the bill is that the pledges may be declared void; that the defendant may account in regard to the partnership dealings; that the court may manage the future partnership business, or dissolve it; and that the defendant may pay to the plaintiff whatever may be due upon a settlement of the account; and for an injunction against selling said lease or said 5,333 shares of stock, or any part thereof, and for further relief. It also alleged that the defendant stated an untrue account with Mr. Wetmore on May 31, 1877, and prays that it be set aside. The claim that there was a stated account was withdrawn at the trial.

The defendant filed his pleas, and an answer to so much of the bill as was not covered by the pleas.

The first plea sets up, as a bar to all the portions of the bill which seek to make the defendant liable for the payment of money, the limitation of two years, which is imposed by section 5057 of the Revised Statutes upon the institution of suits by assignees in bankruptcy. The second plea denies any copartnership between the defendant and Mr. Wetmore. The third and fourth pleas deny the allegations that Exhibits E and F were without consideration, or that the advances which they purport to secure were advances on account of undistributed profits. The fifth plea denies the allegations in regard to a false account of the business of the mine on May 31, 1877. The sixth plea denies that a memorandum given by Mr. Tilden on March 24, 1864, when the assignment of the lease was executed, was a declaration of trust.

The answer denies the other allegations of the bill, and sets up at length the financial relations between Mr. Tilden, Mr. Wetmore, and the corporation, which have been succinctly stated in the finding of facts herein. The answer further alleges that annual correct accountings were had, which were assented to and agreed to by Mr. Wetmore, to and including May 31, 1877, and that all interest received by Mr. Tilden was included in these annual accountings, without objection, and states the displacement of Mr. Wetmore immediately after the discovery of his issue of irregular paper. It relies upon the position that Mr. Wetmore was and is indebted both to Mr. Tilden and to the New York Iron Mine in large sums, and that, as security

for the payment of his specified indebtedness to the former, and his specified and determined and also undetermined indebtedness to the latter, Mr. Tilden is the pledgee and holder of 4,000 shares of said stock, and that the company is the pledgee of 5,333 shares, of which 1,000 shares are subject to the lien of Peter White thereon, who is the holder of the certificates of said stock, and 4,000 shares are subject to the lien of said Tilden thereon, and that all said 5,333 shares are subject by the statutes of Michigan to a lien thereon in favor of said corporation for said Wetmore's indebtedness to it. The answer also avers that said White and said corporation should be made parties to the bill.

The pleas, having been set down for argument, were overruled as pleas, but were allowed to stand as an answer.

The position which was taken in the answer, that the relations between Messrs. Tilden and Wetmore were those of co-stockholders in a corporation, in which they alone had the beneficial interest, subject to the liens of said Peter White and of the corporation itself upon the stock of said Wetmore, and that Mr. Tilden was a pledgee of 4,000 shares of said stock, is true.

It is manifest that upon the bill as it now stands, which relies upon a continuing partnership between the two stockholders, no affirmative relief can be granted; but it is also obvious that, upon the answer and upon the facts which have been stated, the plaintiff is entitled to relief. The case is that of an admitted and unredeemed pledge of stock, the cash value of which is more than the entire probable debt; the amount of the debt being, until recently, "subject to additions not capable of being ascertained."

Upon this state of facts, the statute of limitations, as against an assignee in bankruptcy, is no bar to a suit for the redemption of pledged stock, the validity of the pledge being conceded. A pledge of stock for an admitted debt, and for a debt not then capable of being ascertained, the validity of the pledge also being admitted, who holds simply as a pledgee, not claiming absolute ownership, and who has taken no steps to change his equitable to an absolute title, has not the adverse interest which the statute requires in order to compel the assignee to institute a suit within two years from the date of his appointment. *Gildersleeve* v. *Gaynor*, 15 Fed. Rep. 101.

In accordance with the principles laid down in *Battle* v. *Insurance Co.*, 10 Blatchf. 417; *Neale* v. *Neales*, 9 Wall. 1; and *Hardin* v. *Boyd*, 113 U. S. 756, S. C. 5 Sup. Ct. Rep. 771,—the prayer of the bill can be so amended as to ask that in the event that the court should find that the corporation was duly organized, and that the property was transferred to it, and that the pledges or any of them were valid, there should be an ascertainment of the amount due upon the pledges, and a decree for the redemption of the pledged stock. A court of equity has jurisdiction, when the amount due is unascertained, to ascertain the amount, and decree that the pledgeor may redeem. *Conyng-*

*ham's Appeal,* 57 Pa. St. 474; *Hasbrouck* v. *Vandervoort,* 4 Sandf. 74; 1 Story, Eq. Jur. § 506.

There is enough in the bill to amend by, for a prayer for alternative relief is always proper. The allegations in regard to the issue and sale of certificates of stock are not harmonious or consistent with the allegations of the ownership of said property as partners, the bill already contains a prayer for an injunction against the sale of any portion of the stock; and, while it denies the validity of the pledges, Exhibits E and F, the validity of the earlier and continuing pledge to Mr. Tilden for his own individual debt is not in controversy.

This is a case for amendment which eminently appeals to the favorable discretion of the court; for the amendments to be inserted are harmonious with the answer. The litigation has been an expensive one; the equitable rights of the plaintiff, an assignee for the benefit of creditors, are strong; the testimony already taken is important for the ascertainment of the amount due upon the pledges; and a final determination of this part of the controversy can be speedily had if the plaintiff so desires. It will be necessary to make the New York Iron Mine a party.

It must, however, be observed that this amendment will not bring all the relief to which the plaintiff is entitled, and which he desires to obtain in this suit. The New York Iron Mine has ceased to do business as a mining company, has converted a great part of its property into money, is not, so far as appears, a debtor, and no reason apparently now exists why dividends should not be compelled to be declared. But it is not practicable for the court, under this bill, or by means of any allowable amendment of it, to order the New York Iron Mine to declare dividends. Neither is it possible to direct, under this bill, the division of the money in the possession of Mr. Tilden at the time of his death, on the ground that he and the plaintiff were the only stockholders, and that the directors have only a nominal existence. The proceeding to obtain the declaration of dividends, and their payment or application to the ascertained indebtedness, if such declaration is refused, as I do not assume will be the case, must be against the corporation, by a bill to which, I suppose, Mr. Tilden's executors should also be made parties. The circumstances of this case are peculiar to itself, and the power of a court of equity to grant such relief under the circumstances was expressly conceded by the counsel for the defendant.