Filed 3/17/16  P. v. Scales CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>JAMES KEVIN SCALES,<br><br>      Defendant and Appellant. | B260902<br><br>(Los Angeles County<br>Super. Ct. No. SA082546) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Leslie E. Brown, Judge.  Affirmed in part and remanded with directions.

Pamela J. Voich, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted James Kevin Scales of two counts of robbery and two counts of false imprisonment by violence or menace, and found true personal firearm use allegations as to every count. (Pen. Code, §§ 211; 236; 1203.06, subd. (a)(1); 12022.53, subd. (b).)[1] On appeal, Scales argues the evidence was insufficient to support the jury's four verdicts, and that the trial court erred in failing to instruct on the principles of aiding and abetting. Further, he requests review of the trial court's rulings on his motion for discovery of police personnel records pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*), in accord with the procedures established in *People v. Mooc* (2001) 26 Cal.4th 1216. We correct unauthorized sentences imposed by the trial court on the firearm use enhancement on count 2, and the base term and firearm use enhancements on counts 3 and 4. We otherwise affirm.

**FACTS**

*The Crimes*

From around late 2011 or early 2012 into November 2012, Scales worked as a security guard at a medical marijuana business known as Green Path Collective. Victims Daniel Gonzalez and Talia Schulz also worked at Green Path. In order to gain access to the customer service area, customers needed to push a button near a main entrance door in the alley behind the building, and wait to be "buzzed" inside the premises. Once inside, off the street, customers needed to be "buzzed" through a second door to get to the area where the transactions occurred. There were 16 security cameras positioned at the business, including cameras at the first and second doors.

At some point on November 18, 2012, Scales talked to a manager at Green Path, Gil Sharone.[2] Scales said that he was "leaving Green Path to go back home," and that it would be his last day at work. At about 10:45 a.m., Gonzalez arrived at the business. Shortly after starting work, Gonzalez opened a safe containing cash, approximately 60

---

[1]     All further undesignated section references are to the Penal Code.

[2]     Sharone previously owned Green Path. After selling the business, he helped the new owner manage the business by stopping in for short periods almost every day, doing tasks such as paying bills, office work or "just hanging out."

2

jars of marijuana, and two crates containing more jars of marijuana.  At about 11:30 a.m., Schulz arrived at the business.

Sometime around 2:00 p.m., Gonzalez and Schulz went to the second floor break room and shared a marijuana cigarette.  Gonzalez and Schulz were in the break room for about 20 minutes when Scales walked in and said, "We have a problem."  When Gonzalez and Schulz asked about the problem, Scales said that "there was guys in his house, that they were coming to take over the place, that they took his keys."  When Gonzalez suggested that Scales push the "panic button" in the downstairs office near the safe, Scales replied that there was not time for that, and said, "they're coming already."

Scales then pulled out a pair of handcuffs.  He said that "they" had given him the handcuffs and that "they" wanted him to handcuff Gonzalez and Schulz.  Scales said that Gonzalez and Schulz would be "in trouble" if they refused to be handcuffed.

Scales next pulled a pistol out of his pocket, showed it to Gonzalez and Schulz, and said, "They gave me a gun."  Gonzalez felt scared when he saw the gun, and Schulz was "[s]cared out of [her] mind."  After showing the gun, Scales put it back in his pocket, and said, "It's not loaded if it makes you feel better."

During these first exchanges, Gonzalez thought that several of Scales' statements seemed out of kilter.  For one, Gonzalez thought it was "odd" that Scales said his keys were taken from him because he would have needed his keys to enter Green Path's building.  Gonzalez also believed Scales was lying when he said that someone else had given him the handcuffs because Gonzalez recognized the pouch from which Scales had taken the handcuffs.  Gonzalez had seen the same pouch inside the supply cabinet a month earlier.

After showing and then pocketing the gun, Scales asked for Gonzalez's keys so that Scales could get inside the "camera room."  Gonzalez handed his keys over to Scales, then stood up and placed his hands behind his back and turned around.  Scales then handcuffed Gonzalez and Schulz.  As he was leaving the break room, Scales gave a set of handcuff keys to Gonzalez and said that he could unlock himself and Schulz later.

3

Up to the point when they were handcuffed, Gonzalez and Schulz did not hear anyone else inside the building; neither one had heard any buzzers or door chimes indicating that someone else had entered the building.

As soon as Scales left the break room, Gonzalez locked the door. About five minutes later, Gonzalez heard the sound of "whispering" coming from outside the closed door. He also heard footsteps coming up the stairs. When he heard someone try to open the locked door, Gonzalez yelled out, "Just take whatever you want. Leave us alone." Gonzalez then heard Scales say, "They got a gun to my head. . . . Open the door." Gonzalez unlocked the door, but did not open it. He then walked over and stood by a window, facing away from the door. Schulz, who was sitting down the whole time in the break room, facing away from the door, put her head down. Gonzalez heard the door open, and heard Scales say to someone else, "I did what you want me to do." A second male voice then loudly demanded, "[W]here's your phones?" Gonzalez said his phone was in the kitchen down the hall. Schulz threw her phone behind her on the ground in the direction of the second voice. The second male patted Gonzalez's pockets as if he was searching for a phone. Either Scales or the second male picked up Schulz's phone. Scales and the second male then left the break room, closing the door behind them.

Shortly after Scales and the second male left the break room, Gonzalez and Schulz heard the sound of glass jars being moved around in the "meds room" down the hall, and a sound like trash bags being opened. Gonzalez also heard the sounds of people walking back and forth in the hallway and more sounds of "jars being taken." Schulz also heard the "clinking of the jars." About five minutes later, Gonzalez heard people walking down the stairs, and then the sound of jars being taken from the safe downstairs. He also heard the sound of more trash bags being opened, and what sounded like jars being placed in the trash bags, and a jar shattering. These sounds continued for another five to ten minutes.

After about 15 to 20 minutes of silence, Gonzalez and Schulz used the handcuff keys to unlock themselves. Gonzalez then went to the break room door and tried to open it, but it felt to him that something was on the other side, holding the door from being

4

opened.  He was able to see that a phone cord had been tied around the door knob on the break room door to a door knob across the hall.  Gonzalez cut the phone cord with a pocket knife and he and Schulz were able to get out of the break room.

When Gonzalez and Schulz went to the meds room, they saw that approximately 60 jars of marijuana were missing from the display case in the room.  When Gonzalez and Schulz went downstairs to the check-in desk area, he saw that the surveillance camera screens were dark, and that no signal was coming from any of the 16 security cameras.  Gonzalez also saw that the door to the safe was open, and that the safe was mostly empty.  The money that had been there earlier in the day was missing.  The value of the missing marijuana and cash totaled roughly $45,000.  Gonzalez went home and called his brother, who also worked at Green Path,  and told him what had happened.  Gonzalez's brother apparently called the owner, and eventually someone called the police.

### The Investigation

Los Angeles Police Department (LAPD) Officer David Hale responded to the Green Path building and used a "Find My iPhone App" to locate Schulz's cell phone that had been taken during the robbery events.  It was found on the side of the 10 Freeway about two miles away from the Green Path building.

LAPD Detective George Bowens also responded to the Green Path building, and met with Gil Sharone.  Detective Bowens reviewed the available surveillance video.  Among other things, the video showed Scales walking alone in the alley on November 18, 2012, at time stamp of "2:36."  The video also showed Scales using a key from inside his pocket to open the door and walk into the employee area.  At time stamp "2:37," the video showed Scales at the screen displaying the images from all 16 security cameras.  The video also showed Scales pacing and looking at the screen for approximately 10 minutes.

Detective Bowens went to Scales' residence but he was not there.  Later in the evening of November 18, 2012, the same day of the events at Green Path, Scales' phone was tracked to a location in San Bernardino.  Detective Bowens contacted the San

5

Bernardino Sheriff's Department to do a follow-up, and they "door-knocked the place," but he was not there either.

A warrant was issued for Scales' arrest and placed in a nationwide database. On February 13, 2013, Scales was located in Houston, Texas. He was subsequently brought back to Los Angeles.

### The Criminal Case

In May 2013, the People filed an information charging Scales with two counts of robbery and two counts of false imprisonment by violence or menace. (§§ 211, 236.) Further, as to each of the four counts, the information alleged that Scales personally used a firearm within the meaning of section 12022.53, subdivision (b). During the initial phases of the case, Scales represented himself.

The charges were tried to a jury in late May to early June 2014, by which time Scales had retained private counsel, attorney Stephen Bolinger, to represent him. At trial, the prosecution presented evidence establishing the facts summarized above. Scales did not put on any defense evidence.[3] His trial counsel stressed to the jury the prosecution's burden of proof of beyond a reasonable doubt, and essentially argued that the evidence did not meet that standard because it demonstrated Scales had been forced to act under duress.

The jury returned verdicts finding Scales guilty of all four counts, with a finding as to each count that Scales personally used a firearm in the commission of the crimes. The trial court subsequently sentenced Scales to a total aggregate term of 14 years in state prison as follows: for the robbery charged in count 1, a mid-term of three years plus a consecutive term of 10 years for the firearm enhancement; for the robbery charged in count 2, a one-year term (one-third the mid-term). The court stayed the term for the firearm enhancement as to count 2, pursuant to section 654. For the false imprisonment

---

[3] In a post-verdict motion for a new trial, Scales, then represented by new privately retained counsel, claimed that he had received ineffective assistance of counsel from attorney Bolinger in that Bolinger had dissuaded Scales from testifying in his own defense.

offenses charged in counts 3 and 4, the court imposed identical concurrent terms of eight months (one-third the mid-term).[4]  The court imposed common fines and fees, none of which are at issue on Scales' current appeal.

## DISCUSSION

### I.      Substantial Evidence Supports the Robbery Convictions

Scales contends his two robbery convictions must be reversed because they are not supported by substantial evidence.  Amongst a number of other arguments, he primarily insists that the trial evidence shows that all of his actions during the events at Green Path were involuntarily compelled by duress and threats.  We find the evidence supports Scales' robbery convictions.

When presented with a defendant's claim on appeal that the evidence at trial as insufficient to support a jury's verdict, we review the evidence in the light most favorable to the verdict and presume in support of its judgment the existence of every fact the jury could reasonably have deduced from the evidence.  (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.)  Conflicts in the evidence and even testimony that is subject to justifiable suspicion do not justify the reversal of a jury's verdict, for it is the exclusive province of the trier of fact to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  (*People v. Maury* (2003) 30 Cal.4th 342, 403.)  In other words, where the evidence justifies the findings of the trier of fact, an opinion of a reviewing court that the evidence might also lead to a contrary finding does not warrant reversal.  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

Scales first argues that the evidence regarding the items that were taken during the incident at Green Path was too "sketchy . . . , at least as to the shop's property[,] . . . ," to support any robbery conviction.  He argues that, while Gonzalez and Schulz testified that "marijuana and cash were missing," no prosecution witness testified that they "saw the taking of the shop's property," and no witness could "specifically identify what was

---

[4]      The record does not show a disposition of the firearm enhancements appended to counts 3 and 4, but it appears that the court stayed imposition of sentence on those as well, pursuant to section 654.

taken." Further, Scales argues that Sharone "was not there that day so he did not know the amounts of cash and property that had been present . . . ." Scales argues the shop's owner would have had personal knowledge of the cash and inventory, but did not testify.

To the extent Scales is arguing that the evidence did not prove that a robbery occurred because it did not prove that *any* property was taken, we disagree. Regardless of the specifics of an accounting, Gonzalez testified that cash and jars of marijuana were in the shop before the incident at Green Path, and that cash and jars of marijuana were not in the shop after the incident at Green Path. Plainly, circumstantial evidence shows that property was taken. There is no authority cited in Scales' arguments to support the proposition that an accounting is a required element of the crime of robbery.

Insofar as Scales is arguing that the evidence did not prove that any robbery occurred because it did not prove that property was taken from the "immediate presence" of a victim, we disagree. It is too well-settled to question in Scales' current case that a store employee may be the victim of a robbery even though he or she is not its owner and not at the moment of the taking in immediate control of the stolen property. (See *People v. Scott* (2009) 45 Cal.4th 743, 751.)

Scales next argues that the "[e]vidence on [the element of] asportation is nearly non-existent." We again disagree and repeat that the evidence showed that cash and jars of marijuana were in the shop before the incident at Green Path, and they were not in the shop after the incident at Green Path. Plainly, circumstantial evidence showed that property was asported away from the shop.

Next, Scales argues that the evidence did not prove the element of force or fear during "any phase of this robbery" because, while the evidence undisputedly showed that Gonzalez and Schulz were "physically restrained and confined to the break room," it further showed that they "cooperated" in being restrained and confined. We summarily reject this argument because the evidence did not show as a matter of law that Gonzalez and Schulz cooperated in anything. The jury reasonably could have found, and did find, that any and every act that the victims did in this case, they did in the face of threats that they would be "in trouble," which threats were uttered by a person holding a gun and

8

handcuffs.  We also add that the evidence showed that Scales stood six feet three inches tall, and weighed approximately 300 pounds.  We are satisfied that the evidence showed the use of force or fear.

Scales also contends the evidence did not prove that he harbored the specific intent to deprive any victim of property permanently.  We disagree.  As the Supreme Court has explained, the intent required for robbery "is seldom established by direct evidence but instead is usually inferred from all the facts and circumstances surrounding the crime." (*People v. Lewis* (2001) 25 Cal.4th 610, 643.)  Here, the evidence showed a takeover of a business, the handcuffing of the employees at gunpoint, and the restraining of the victims in a room with a phone cord tied to hold the door shut.  Again, we find that the jury reasonably inferred that the perpetrators intended to take property permanently.

We now come to the predominant aspect of Scales' substantial evidence argument on appeal.  Here, Scales claims that to the extent the evidence proved that he was involved in the events at Green Path, he could not be convicted of robbery because the evidence showed that he acted under the compulsion of duress and threats from others. Scales' arguments are not persuasive because they amount to little more than a request that we reweigh the evidence on appeal in his favor.

The jury, as the final judge of credibility and vested with the authority to resolve any conflicts in the evidence, reasonably found that the facially exculpatory statements made by Scales during the robbery events at Green Path, i.e., all of the statements suggesting that he was being threatened to assist other actors, were nothing more than simple play-acting.  Given the surrounding circumstances of the robbery events at Green Path, and subsequent events, it was within the jury's prerogative to believe that Scales was acting as a co-equal perpetrator with the other robbers on site, not against his will. This is particularly true given the oddities concerning the entry into the premises, and Scales' departure from California after the events at Green Path.  While there was no evidence expressly showing the relationship between Scales and the other robbers, that is not a basis for concluding that the jury was required to make a factual finding that he acted under compulsion of duress and threats.

9

**II.     Jury Instructions on Aiding and Abetting Principles Were Not Warranted**

Scales contends all four of his convictions must be reversed because the trial court did not instruct sua sponte on aiding and abetting principles.  We disagree.

A trial court generally must instruct on principles of law that are connected to the facts in a case and that are necessary for the jury's understanding of the case, even in the absence of a request for such instructions.  (*People v. Carter* (2003) 30 Cal.4th 1166, 1210)  In accord with this rule, it is well-settled that aiding and abetting instructions must be given when the prosecution's theory of criminal liability against a defendant involves derivative culpability, and substantial evidence supports the theory.  (See, e.g., *People v. Delgado* (2013) 56 Cal.4th 480, 488.)  In contrast, aiding and abetting instructions need not be given when the prosecution's theory and the evidence are that the defendant was a direct perpetrator in a crime.  (See *People v. Brown* (2003) 31 Cal.4th 518, 559; and see also *People v. Sassounian* (1986) 182 Cal.App.3d 361, 404-405.)

Scales' argument about an instructional omission fail because the record simply does not support his assertion on appeal that the prosecution relied on a theory of aiding and abetting liability at his trial.  We have read every word of the prosecutor's arguments to the jury at Scales' trial, both before and after the defense argument, and find that the prosecutor never raised, or even suggested, that Scales could be found guilty on an aiding and abetting theory of liability.  The most that can be said is that the prosecutor acknowledged Scales' duress defense, which implicitly recognized that there were other people involved in the crimes.  This is a far cry from presenting a prosecution case based on a theory of aiding and abetting liability.  We simply see no error.

But even assuming the trial court erred in not instructing sua sponte on aiding and abetting principles, we would find the error harmless beyond all possible doubt.  Not giving instructions on aiding and abetting means that the jury necessarily found Scales guilty because it found he was a direct perpetrator; the jury was not apprised of any other option to consider.  The instructions given did not lower the prosecution's burden of proof as Scales seems to suggest.  On the contrary, the jury was restricted to the prosecution's one theory of guilt, namely, direct perpetrator liability, not two theories of

guilt, namely, direct perpetrator liability and a fall-back theory of aider and abettor liability. It appears to this court that the absence of instructions on aiding and abetting principles worked to Scales' advantage because it meant the jurors could find him guilty only if they found that he personally and directly participated in the events at Green Path.

*People v. Delgado, supra*, 56 Cal.4th 480, is instructive on the problem of finding prejudice from a failure to give aiding and abetting instructions when a defendant has been found guilty under instructions based on direct perpetrator liability: "'[I]t is hard to imagine how an aiding and abetting instruction would have helped [the defendant], as it would have merely offered an alternative, additional means of establishing [his part in the taking of the property] without having to prove [that the defendant personally] took part in'" the taking. If the jury had been instructed on derivative liability, "defense counsel would have been limited to arguing defendant was not responsible for the [perpetrator's] actions, an argument that would have been unlikely to persuade the jury given the strong circumstantial evidence defendant and the [perpetrator] were working together to kidnap and rob . . . ." (*Id*. at p. 492.)

Scales argues the lack of aiding and abetting instructions was prejudicial because, where criminal liability is based on an aiding and abetting theory, the defendant's intent to encourage or facilitate the actions of the perpetrator *must be formed prior to or during* commission of the offense. (Citing *People v. Montoya* (1994) 7 Cal.4th 1027, 1039, emphasis added.) He argues this would have been very difficult for the prosecution in the trial against him because, he says, "there was absolutely no evidence presented that connected [him] to the . . . unidentified perpetrators of the robbery, let alone showed he shared their intent." He implicitly seems to propose that aiding and abetting liability requires proof of some form of prior agreement, or, at least, some pre-existing understanding that he would cooperate with the direct perpetrators, which cannot be provided without evidence of the nature of their relationship. We are not persuaded.

Scales' argument could only begin to be persuasive had he been prosecuted on an aiding and abetting theory. As we have pointed out, no aiding and abetting instructions were given. But where, as in Scales' case, instructions on direct perpetrator liability were

11

given, a failure to show a connection between the defendant and other actors is not a meaningful issue. Here, the evidence and theory presented by the prosecution were that Scales acted in concert with others, not that he assisted or encouraged others. A failure to show a connection would only be a factor in the event the case against Scales was based on an aiding and abetting theory.

## III. Substantial Evidence Supports the False Imprisonment Convictions

Scales contends his two false imprisonment convictions must be reversed because they are not supported by substantial evidence. Here, Scales abandons the duress claim he raised to attack his robbery convictions, and argues the evidence was not sufficient to support the jury's necessarily included factual finding that he used "violence or menace" to restrain, confine or detain Gonzalez and Schulz against their will. We disagree.

The crime of false imprisonment is the "unlawful violation of the personal liberty of another." (§ 236.) The essential element of the crime is the restraint of the person. (*People v. Bamba* (1997) 58 Cal.App.4th 1113, 1123.) When such restraint is "effected by violence [or] menace, . . . " the crime is punishable as a felony. (§ 237, subd. (a).) Violence means the use of physical force greater than the force reasonably needed to effect the restraint. (*People v. Matian* (1995) 35 Cal.App.4th 480, 485.) Menace means a threat of harm, and generally falls into two categories: (1) the use of deadly weapon to effect the threat, or (2) verbally threatening harm with the apparent intent and ability to carry out the threat. (*Id*. at pp. 484-486.)

We find the evidence is sufficient to support a finding of either violence or menace, or both, or a combination of both. Viewed in the light supporting the jury's verdicts, the evidence showed that Scales showed a gun to Gonzalez and Schulz, and took out handcuffs and told them that they would get "in trouble" if they refused to be handcuffed. Scales personally put handcuffs on Gonzalez and Schulz. Both Gonzalez and Schulz testified that they were scared when they saw the gun. Scales' argument on appeal that the gun was "clearly not used to effectuate any restraint" or to "threaten Gonzalez and Schulz with any harm" amounts to no more than a request that we reweigh the evidence and substitute our conclusions for those reached by the jury. Under the

12

circumstances of a take-over incident, Scales' statements about the gun not being loaded did not negate the violence or menace. Our view is the same as to Scales' argument on appeal that Gonzalez and Schulz "consented" to be restrained by the handcuffs. The evidence supports a conclusion that Gonzalez and Schulz submitted to being handcuffed under circumstances that any reasonable person would perceive to be a very real threat of harm.

**IV.     Substantial Evidence Supports the Firearm Use Findings**

Scales next contends the jury's firearm findings on all four of his convictions must be reversed because they are not supported by substantial evidence. Scales argues the evidence did not establish that he used the gun that he had at Green Path "in order to facilitate the commission of an underlying crime," which, he says, is a required element for the firearm enhancement alleged under section 12022.53, subdivision (b). In this vein, Scales argues that a firearm use finding is not supported by the evidence where it shows that a defendant's use of a firearm "appears to be purely incidental to the crime." (Citing *People v. Granado* (1996) 49 Cal.App.4th 317, 324 (*Granado*).) We find no deficiency in the evidence supporting the jury's firearm use findings in Scales' current case.

"[W]hen a defendant deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure." (*People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1059, citing *Granado*, at p. 325.) Further, it is well settled that the firearm need not actually be loaded. (*People v. Steele* (1991) 235 Cal.App.3d 788, 791-795.)

When the evidence is viewed in the light most favorable to the jury's findings, it cannot be said that there was no substantial evidence to support the firearm use enhancements. The evidence did not show that Scales merely had a gun holstered at his side, or sticking out of his pocket. He deliberately displayed his gun to Gonzalez and Schulz. Further, Scales was displaying the gun during the same exchange in which he

13

threatened Gonzalez and Schulz they would get "in trouble" if they refused to be handcuffed. Both Gonzalez and Schulz testified that they were scared when Scales displayed the gun. Deliberately displaying the gun in plain sight to the victims during a robbery and false imprisonment is sufficient to support the jury's finding that Scales "used" the gun during the crimes, not merely that he had it "incidentally" to the crimes. The fact that Scales volunteered that it was not loaded does not defeat the jury's findings as a matter of law, as we have pointed out. Further, the jury was not required to accept Scales' representation that the gun was not loaded.

## V.    The Trial Court Correctly Reviewed the Police Officers' Personnel Files

In May 2013, the prosecution filed an information charging Scales as noted above. At a pre-trial hearing in June 2013, the trial court relieved Scales' public defender and granted his request to represent himself. In September 2013, Scales filed a handwritten motion for discovery of "[a]ll complaints from all sources" from 12 listed LAPD officers. The prosecution filed a response to the *Pitchess* motion, arguing that Scales had failed to make the requisite showing of materiality and good cause for discovery as to any of the officers' personnel files.

On October 25, 2013, the trial court granted Scales' *Pitchess* motion as to LAPD Officers "Barone and Bowens," and then conducted an in camera review of the officers' personnel files and found "no discoverable information."

On appeal, Scales has requested our court to review the record independently to determine whether the trial court (1) conducted a proper *Pitchess* review in camera, and (2) made a proper ruling on the reach of discovery of the officers' personnel files. Such review on appeal is proper under the procedures set forth in *People v. Mooc, supra*, 26 Cal.4th 1216.

We have reviewed Scales' *Pitchess* motion, the prosecution's response, and the transcript of the in camera review, and conclude that the trial court properly conducted the *Pitchess* hearing, describing the nature of all complaints, if any, against the officers. Further, we find the court did not abuse its discretion in ruling there was no discoverable evidence that needed to be disclosed.

14

**VI. The Trial Court Imposed Unauthorized Sentences on the Enhancement on Count 2 and the Sentences on Counts 3 and 4.**

We have independently reviewed the sentence in this case and found that the trial court imposed an unauthorized sentence on the firearm enhancement on count 2 and the sentences on counts 3 and 4.

When the base term for an offense is imposed consecutively, as was the case in count 2 here, any conduct enhancement must be imposed consecutively as well. (*People v. Mustafaa* (1994) 22 Cal.App.4th 1305, 1309-1311.) An unauthorized sentence may be corrected at any time. (*People v. Massengale* (1970) 10 Cal.App.3d 689, 693.) Further, when an illegal sentence is vacated, the court may substitute a proper sentence even though it is more severe than the sentence originally imposed. (*In re Renfrow* (2008) 164 Cal.App.4th 1251, 1256; *People v. Grimble* (1981) 116 Cal.App.3d 678, 685.) We therefore lift the stay imposed on the enhancement in count 2 and impose the mandatory consecutive term of one-third the middle base term of three years and four months, consecutive to the one-year consecutive sentence on count 2, for a total term of four years and four months as to that count. (*People v. Moody* (2002) 96 Cal.App.4th 987, 992-994; see also § 1170.1, subd. (a).)

In addition, the court imposed an unauthorized sentence on counts 3 and 4. On those two counts, the court imposed concurrent sentences of one-third the middle base term and entirely failed to impose sentence on the 12022.53, subdivision (b) enhancements. In a concurrent sentence, each count is sentenced with the *full term* of the base term, plus the *full term* of any conduct enhancements. (§§ 669, 1170.1, subd. (a); *People v. Bruner* (1995) 9 Cal.4th 1178, 1182, fn. 3.) This, too, is an unauthorized sentence subject to correction on review. (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1156, fn. 3.) We cannot be certain the trial court in fact selected the middle base term on counts 3 and 4 to be the appropriate base term from the triad on those counts, or mistakenly felt constrained to impose one-third of the middle base term under the mistaken belief the choice of the middle term was required, as is the case in consecutive sentences. As a result, we must remand the matter to the trial court to correct the

sentence by choosing a base term from the triad on counts 3 and 4, imposing those full base terms, and then imposing full term consecutive sentences on the firearm enhancements on each count. The court should then re-order counts 3 and 4 to run concurrent to one another and all other counts.

## DISPOSITION

The matter is remanded to the trial court to impose its choice of a full term sentence on the base terms in counts 3 and 4 and the enhancements appended to those counts 3 and 4 in accord with this opinion and run those terms concurrent. After doing so, the clerk is ordered to correct the abstract of judgment which should also reflect the imposition of the enhancement in count 2 in accord with this opinion. In all other respects, the judgment is affirmed.

BIGELOW, P.J.

We concur:

FLIER, J.

GRIMES, J.

16