[No. A069538. First Dist., Div. Two. Sept. 13, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH PHILIP GRANADO, Defendant and Appellant.

COUNSEL

Gail Harper, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Joan Killeen and Moona Nandi, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**LAMBDEN, J.**—Penal Code section 12022.5, subdivision (a),[1] imposes a sentence enhancement on any person who "personally uses a firearm in the commission or attempted commission of a felony." Does this "use enhancement" apply to a defendant who displays a handgun during the attempted robbery of two people, but who neither discharges the gun, nor points it at the victims, nor utters any verbal threats? What is the legal effect of such a display if one of the victims does not see the gun or otherwise know of its presence? Although a few courts have suggested the enhancement will not lie in these circumstances, we find no statutory or other basis for that conclusion. Accordingly, we will uphold the trial court's imposition of use enhancements as to both victims.

## BACKGROUND

Defendant Joseph Philip Granado was charged in two counts with the attempted robberies of Walter Calderon and Wilfredo Calderon and, as to each count, the personal use of a firearm warranting a sentence enhancement under section 12022.5, subdivision (a).

At trial Walter Calderon testified that on December 5, 1993, he and his brother Wilfredo were walking on Monument Boulevard in Concord when they became aware that defendant and another man were following them. Defendant repeatedly demanded money. Eventually he and his companion stepped in front of the brothers and turned to face them, blocking their progress. Wilfredo asked defendant "why was he asking us for money when we didn't have money for him." Defendant's companion pulled a "great big machete" from a sheath. Defendant took a small black automatic handgun "[f]rom his waist." At this moment—or perhaps before it—Wilfredo "took off running." The man with the machete chased him.

Holding the gun in front of himself, but without pointing it at anyone, defendant persisted in demanding money from Walter. Walter, who was

---

[1]All further statutory references are to the Penal Code.

afraid something would happen to him or his brother, "got ready to give him the money." Defendant put the gun back in his waistband. About this time, however, Walter heard Wilfredo yelling that there were police nearby. He decided to hold back the money he had been preparing to give defendant. Defendant grabbed Walter by the shirt, tried to pull him to the ground, and punched him. Walter slipped from the shirt. The man with the machete came running back, saying, "Let's go. The police is here." He and defendant ran away. Shortly thereafter, police officers apprehended defendant. At the police station he was heard to say, "I tried to rob someone."

The court instructed the jury, in the language of CALJIC No. 17.19, as follows: "The term 'used a firearm,' as used in this instruction, means to display a firearm in a menacing manner, intentionally to fire it, or intentionally to strike or hit a human being with it." During deliberations the jury sent a note to the court asking whether both victims had to be aware of the gun for defendant to have used a gun as to both. Over defense objection, the court replied, "No."

The jury convicted defendant on both counts of attempted robbery and sustained the allegations that, as to both counts, he personally used a firearm within the meaning of section 12022.5, subdivision (a). The court sentenced him to mitigated and concurrent terms totaling four years and four months in state prison.

This appeal followed.

ANALYSIS

I.

The central issue is whether the jury properly found defendant to be a "person who personally use[d] a firearm in the commission" of the charged attempted robberies.[2] According to the evidence, as defendant concedes, he

---

[2]As in effect in 1994, when the offenses took place, the governing statute provided, "Except as provided in subdivisions (b) and (c), any person who personally uses a firearm in the commission or attempted commission of a felony shall, upon conviction of that felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of imprisonment in the state prison for three, four, or five years, unless use of a firearm is an element of the offense of which he or she was convicted. However, if the person has been convicted of carjacking or attempted carjacking, the additional term shall be four, five, or six years. The court shall order imposition of the middle term unless there are circumstances in

took a gun from his waistband while standing within a few feet of Walter Calderon and displayed it while demanding money. Whether this constitutes "personal use" of a gun is a question primarily of statutory meaning.

Nothing in the language of section 12022.5(a) discloses a legislative intent to limit its application to situations where the gun is pointed at the victim or the defendant issues explicit threats of harm. " 'Use' means, among other things, 'to carry out a purpose or action by means of,' to 'make instrumental to an end or process,' and to 'apply to advantage.' (Webster's New Internat. Dict. (3d ed. 1961).) The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that 'uses' be broadly construed." (*People* v. *Chambers* (1972) 7 Cal.3d 666, 672 [102 Cal.Rptr. 776, 498 P.2d 1024] (*Chambers*).) In other words, the term "use," as employed in this statute, should be broadly construed, consistent with common usage, to check the magnified risk of serious injury which accompanies any deployment of a gun in a criminal endeavor.[3]

Defendant acknowledges this broad interpretive directive, but nonetheless discerns in the cases a rule which precludes a finding of use, based on the display of a firearm, unless the gun is pointed at a person or fired, or the display is accompanied by verbal threats. With one apparent exception, the cases cited by defendant are only obliquely relevant to this issue. The exception is *People* v. *Jacobs* (1987) 193 Cal.App.3d 375 [238 Cal.Rptr. 278], review denied (*Jacobs*), where the court appeared to confine culpable firearm use to two exclusive categories of conduct: first, where the defendant either aims or intentionally fires the gun or strikes the victim with it; and

---

aggravation or mitigation. The court shall state its reasons for its enhancement choice on the record at the time of sentencing." (Former § 12022.5, subd. (a).)

The statute has since been amended to, among other things, divide the quoted provision into subparagraphs (a)(1) and (a)(2). (Stats. 1995, ch. 377, § 9; see also Stats. 1st Ex. Sess. 1993-1994, ch. 31, § 3; Stats. 1st Ex. Sess. 1993-1994, ch. 33, § 6.)

Throughout this opinion we will refer to the quoted provision as "section 12022.5(a)," disregarding the subparagraphs.

[3]We have found only one statutory provision which constrains the concept of firearm "use" to anything narrower than its common meaning: Section 1203.06, subdivision (a)(1), declares ineligible for probation any defendant "who personally used a firearm" in the commission of certain specified offenses. Subdivision (b)(3) then provides, "As used in subdivision (a), 'used a firearm' means to display a firearm in a menacing manner, to intentionally fire it, or to intentionally strike or hit a human being with it." Although the applicability of this definition is by its own terms limited to the statute of which it is a part, it has been declared applicable to section 12022.5. (*People* v. *Johnson* (1995) 38 Cal.App.4th 1315, 1319 [45 Cal.Rptr.2d 602], review den.) Indeed, it has been incorporated in CALJIC No. 17.19, the pattern jury instruction concerning weapon use enhancements, which was read to the jury here. Perhaps for this reason, defendant places no reliance on the language of section 1203.06.

second, where the defendant makes "some type of display of the weapon, *coupled with a threat to use it which produces fear of harm in the victim* . . . ." (193 Cal.App.3d at p. 381, italics added.)[4]

In *Jacobs* the defendant, during a test drive, instructed an auto salesman to get out of the car. When the salesman refused, the defendant said, " 'I have a gun and I don't want to use it.' " (193 Cal.App.3d at pp. 378-379.) When the salesman exhibited disbelief by reaching for the keys, the defendant reached into his jacket and audibly cocked an unseen gun. (*Id.* at p. 379.) The jury found a gun "use." (*Id.* at p. 378.) The Court of Appeal affirmed. The pivotal issue was *not* whether the defendant's words or conduct amounted to such a "threat" as would support the enhancement, or even whether a distinct "threat" was necessary.[5] The question, instead, was whether the defendant's conduct amounted to a "display" of the gun. In that regard, the court declared, "a firearm is displayed when, by sensory perception, the victim is made aware of its presence." (*Id.* at p. 381.) The court went on, however, to issue the dictum on which defendant relies: "Once displayed in such fashion, the threat of use sufficient to produce fear of harm becomes a use of that firearm proscribed by Penal Code sections 12022.5 and 1203.06, subdivision (a)(1)." (*Ibid.*)

The court in *Jacobs* cited no authority in support of this statement (193 Cal.App.3d 375, 381), but had earlier alluded to the synopsis of prior decisions in *People* v. *Hays* (1983) 147 Cal.App.3d 534, 548 [195 Cal.Rptr. 252] (*Hays*). After summarizing the decisions at length (*id.* at pp. 544-549), the *Hays* court had observed, "[O]f the 14 cases finding use enhancement proper, 12 of them show the defendant aimed, cocked, or fired the weapon. The 13th . . . found a use enhancement where the gun was in the hands of the defendant while he verbally threatened the robbery victims. The 14th . . . did not involve touching the weapon but exposing it in a menacing

[4]In *People* v. *James* (1989) 208 Cal.App.3d 1155, 1163 [256 Cal.Rptr. 661], review denied, the same court which decided *Jacobs* again classified existing cases into these categories. However, its remarks there are readily understood as a description of prior results, as distinct from a statement of a rule of law.

[5]Indeed the court's apparent assumption that the defendant's words constituted a sufficient "threat" illustrates the pointless analytical perplexities such a requirement would introduce. The *literal* meaning of the defendant's words there (" 'I have a gun and I *don't* want to use it' ") was not that he would shoot the victim, but rather the reverse. (193 Cal.App.3d at p. 379, italics added.) To be sure, anyone in the victim's position would have understood the *implicit* threat, but if an indirect or implied threat is sufficient, what is the meaning—or purpose—of requiring *any* "threat?" The communication of menace is no less unequivocal or unmistakable, and indeed seems inherent, where (as here) a would-be robber produces an otherwise concealed gun for no other apparent reason than to be ready to shoot the victim, or convey the willingness and ability to do so, to carry out the robbery. Threatening language, while it may be compelling evidence of a direct link between the firearm display and the underlying crime, is hardly necessary to prove such a link.

fashion accompanied by words threatening a more violent use." (*Id.* at p. 548.) The *Jacobs* court apparently viewed this categorization of prior decisions as an exclusive catalog of culpable "uses," such that an enhancement could *only* be sustained if it fell within one of the previously recognized fact patterns.

■ A pattern of fact situations triggering a given rule in previous cases does not automatically preclude the application of the same rule to new or different fact situations. The contrary approach implicitly followed in *Jacobs* suffers from several flaws, of which the most simply stated is this: Since none of the cited cases involved a materially similar fact situation, or purported to address the issue in question, none of them could be authority for the question on which the *Jacobs* court declaimed. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 783, p. 753.)

Nor were these cases somehow transformed into relevant authority through the decision in *Hays*, which illustrates a quite different point. The defendant there carried a sawed-off rifle on a sling during the commission of a robbery. There was no evidence of the defendant's handling the rifle, let alone "displaying it in a menacing manner." (*Hays, supra,* 147 Cal.App.3d 534, 544.) The court struck the enhancement because the defendant had only "passively displayed" the rifle, and therefore did not use it. (*Id.* at pp. 548-549.)[6]

The holding in *Hays* reflects a principle under which a finding of weapon use is precluded if the defendant's *conduct* with respect to the weapon appears to be purely incidental to the crime. In *Hays* the evidence was insufficient because, even though the gun was exposed to the victim's view, the exposure was not an act in furtherance of the crime, but a mere incident of possession.[7] The court drew the term "passive display" from a discussion in which the Supreme Court had observed, "[A]rmed offenders frequently

[6]On a separate count for assault, the court found sufficient evidence to support a "use" enhancement (*Hays, supra,* 147 Cal.App.3d at p. 551): "Hays pointed the gun at Art Smart and ordered him to move. This was a menacing display within the reasoning of *People* v. *Washington* [(1971)] 17 Cal.App.3d 470, 475 [94 Cal.Rptr. 882]."

[7]The court also noted an implied legislative distinction between firearm "use" under 12022.5(a), and being "'armed' with a firearm" in the commission of a felony, which warrants a distinct enhancement under section 12022, subdivision (a) (§ 12022(a)). (*Hays, supra,* 147 Cal.App.3d 534, 549.) The same implied distinction was noted in *Chambers, supra,* 7 Cal.3d 666, 672, as follows: "By employing the term 'uses' instead of 'while armed' the Legislature requires something more than merely being armed . . . . [T]he use of a firearm connotes something more than a bare potential for use . . . ."

Contrary to defendant's contentions, the logical necessity of distinguishing "use" from "arming" supplies no basis for imposing the kind of categorical extrastatutory limitations defendant proposes. The litmus test for the distinction is functional: did the defendant take

may passively display their firearms, without actually using them to facilitate the commission of their offenses." (*People* v. *Nelums* (1982) 31 Cal.3d 355, 360 [182 Cal.Rptr. 515, 644 P.2d 201].) We view that statement as confirming the commonsense requirement of a facilitative, gun-related *act* before the defendant can be found to have "used" the gun.[8] Nothing in *Nelums*, however, requires express threats, or other specific types of conduct, to establish firearm "use."

 In our view, if the defendant is found on substantial evidence to have displayed a firearm in order to facilitate the commission of an underlying crime, a use of the gun has occurred both as a matter of plain English and of carrying out the intent of section 12022.5(a). Thus when a defendant deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure. The defense may freely urge the jury not to draw such an inference, but a failure to actually point the gun, or to issue explicit threats of harm, does not entitle the defendant to a judicial exemption from section 12022.5(a).

 Here there was no reasonable explanation for defendant's conduct other than a desire to facilitate the crime. After the victims ignored his initial demands for money, he removed the gun from his waistband, repeated his demands, and returned the gun to his waistband. This was not conduct incidental to possession. The most obvious explanation, indeed the only apparent one, was a deliberate display, intended to convey menace, for the purpose of advancing the commission of the offense. (See *People* v. *Johnson*, *supra*, 38 Cal.App.4th 1315, 1321 ["No other purpose could be served by defendant moving the gun from his waistband to his hand"].) This was sufficient to establish "use" within the contemplation of section 12022.5(a).

---

some *action* with the gun *in furtherance of the commission* of the crime? If so the gun was "used," and the more severe penalty of section 12022.5(a) applies. If, on the other hand, the defendant engaged in no weapons-related conduct, or such conduct was incidental and unrelated to the offense, no "use" occurred, and only the lesser enhancement of section 12022(a) applies. (See *People* v. *Elliott* (1977) 70 Cal.App.3d 984, 988 [139 Cal.Rptr. 205] [defendant carried knife in holster]; *People* v. *James*, *supra*, 208 Cal.App.3d 1155, 1163 [defendant had knife, but no evidence that he did anything with it].)

[8]We regret the use of the term "passive display" to describe this principle. It is, among other things, an oxymoron. To "display" something is "to *put . . .* [it] before the view," "to *make* [it] evident," or to "*exhibit* [it] *ostentatiously.*" (Webster's Ninth New Collegiate Dict. (1984) p. 365, italics added.) A "display," in the sense that a gun is displayed by a would-be robber (as distinct from a display in a museum), is an *act*. To speak of a passive act is, of course, self-contradictory. The situation in question—where a weapon is or becomes visible as an incident of possession, or of other circumstances or events unconnected with the commission of the offense—would more accurately be described by a term such as "incidental exposure."

## II.

■ Defendant next urges us to set aside the use finding as to the victim Wilfredo because, he contends, the evidence did not establish, and the jury was not likely to find, any awareness by Wilfredo that a gun was present.

Much the same reasoning we have already articulated compels us to reject a rule which would preclude a finding of gun use in an attempted robbery unless the victim were shown to have been aware of the gun's presence. Again, such a requirement finds no support in the statutory language, and we know of no well-considered case which has endorsed or applied it.

The strongest authority for defendant's position appears to be *People* v. *James, supra,* 208 Cal.App.3d 1155. After alluding to the categorization of prior results in *Jacobs, supra,* 193 Cal.App.3d 375, 381, the *James* court declared, "[F]or weapon use to be found within the second category [i.e., where use consists of menacing display], the victim must be made aware of the weapon's presence. ([Citing *Jacobs*].)" (208 Cal.App.3d 1155, 1163.) Since there was "no evidence that [the victim in *James*] was aware of the knife," the court concluded, the enhancement should not have been sustained. (*Ibid.*)

As with *Jacobs,* we endorse the *result* in *James:* the court set aside a finding of weapons use where the victim did not claim to have seen the weapon, and in fact did not testify about it "at all." (*People* v. *James, supra,* 208 Cal.App.3d 1155, 1163.) The court's rationale, however, suffers in our view from a failure to distinguish between the victim's knowledge or observations as (sometimes necessary) *evidence* of use, and the victim's knowledge as (in effect) an *element* of use. The result could have been explained, and was in fact compelled, by the apparent absence of evidence of *any* weapon-related *conduct* beyond mere possession. If the victim is alone with the defendant at the time of an offense, his or her perceptions of the weapon may well be the only evidence the prosecution can hope to present of facilitative, weapon-related conduct. It may therefore be impossible to prove the enhancement where such evidence is lacking. To go beyond this practical reality, however, and make the victim's state of mind an element of the enhancement, would introduce significant complications which lack any apparent basis in statutory text or, so far as we can determine, legislative or jurisprudential policy.

■ As courts have recognized (e.g., *People* v. *Nelums, supra,* 31 Cal.3d 355, 359-360), some of the hazards presented by the criminal use of firearms are peculiar to the situation where the victim knows of the gun's presence.

As a matter of common sense and experience, however, these hazards appear to comprise but a small part of the constellation of risks arising from firearm use. At its core the statute addresses the pervasive and inherent escalation of danger which arises from the *defendant's act* of deployment. By merely bringing a gun "into play," the defendant removes impediments to its actual discharge and thus enhances the danger of violent injury not only through an intentional act by the victim or a third party, but through an impulsive or inadvertent act by the defendant. It requires no statistical study to know that a gun is far more likely to go off while held in the hand than while resting in a pocket, holster, or waistband.

 We believe section 12022.5(a) was intended in significant part to constrain a would-be robber in defendant's position to *keep the gun in his waistband.* So long as he did so, he would be subject only to the enhancement for being armed. But once he intentionally deployed the gun in furtherance of the offense, he became subject to a use enhancement. To excuse the defendant from this consequence merely because the victim lacked actual knowledge of the gun's deployment would limit the statute's deterrent effect for little if any discernible reason. (See *People* v. *Fierro* (1991) 1 Cal.4th 173, 225-227 [3 Cal.Rptr.2d 426, 821 P.2d 1302] [enhancement sustained based on shooting of robbery victim's companion, although robbery victim not aware of any gun when she gave property to robber].)

Defendant seeks to draw support for the opposite view from the Supreme Court's remark in *Chambers, supra,* 7 Cal.3d 666, 672, that in order to sustain a gun-use enhancement, "there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force . . . ." The implication is that *Chambers* requires actual fear of the gun on the part of the victim—an impossibility without knowledge of the gun. In light of the decision as a whole, however, we do not believe the quoted sentence is properly understood to require proof of actual fear or knowledge. It is more reasonably understood to mean that the conduct must be such as "produces a fear of harm or force" on the part of a hypothetical, reasonable observer—such as a juror looking back at the event through the lens of the evidence at trial. (*Ibid.*)

Defendant's contrary interpretation is incompatible with the injunction in *Chambers* itself that the statute must "be broadly construed." (7 Cal.3d at p. 672.) It is also incompatible with the result in that case, in light of the evidence there presented.

The defendant in *Chambers* had simply "pointed a gun at the victim and demanded money." (7 Cal.3d 666, 672.) The recitation of facts contains no

indication that the victim was in fact shown to be frightened. (*Id.* at p. 669.) Chief Justice Wright declared the evidence "more than sufficient to support a finding that defendant used a firearm within the meaning of section 12022.5 in the commission of the offense." (*Id.* at p. 673.) Immediately after this declaration (*ibid.*), the Chief Justice cited a passage from the venerable case of *United States* v. *Wilson* (C.C.E.D.Pa. 1830) 28 Fed. 699, 708, in which the court discussed the proof required for a conviction of robbing the mail by putting a carrier's life in jeopardy by use of a gun. As the court in *Wilson* explained, the offense could be committed without explicit threats, and without pointing the gun at the carrier, provided the gun was produced and displayed in such a way as to provide the carrier "*reasonable cause* for believing" it would be fired if he or she failed to comply with the robber's demands.[9] (*Id.* at p. 708, italics added.) The endorsement of this discussion in *Chambers* precludes any suggestion that the court there intended to condition use enhancements on a finding that the victim was actually put in fear by the defendant's gun-related conduct. (Accord, *People* v. *Cory* (1984) 157 Cal.App.3d 1094, 1103-1104 [204 Cal.Rptr. 117]; see *People* v. *Wolcott* (1983) 34 Cal.3d 92, 102 [192 Cal.Rptr. 748, 665 P.2d 520] ["menacing display" sufficient]; *People* v. *McGee* (1993) 15 Cal.App.4th 107, 115 [19 Cal.Rptr.2d 12] [same]; *People* v. *Colligan* (1979) 91 Cal.App.3d 846, 851 [154 Cal.Rptr. 389] [same].)

In our view the only mental state requirement properly imposed on section 12022.5(a) enhancements is the *defendant's intent* to use the gun in furtherance of the crime. (*People* v. *Johnson, supra,* 38 Cal.App.4th 1315, 1319; *People* v. *Wims* (1995) 10 Cal.4th 293, 302 [41 Cal.Rptr.2d 241, 895 P.2d 77] [to sustain allegation of personal gun use, "a fact finder must conclude that, during the crime or attempted crime, the defendant himself or herself *intentionally displayed in a menacing manner* or struck someone with an instrument capable of inflicting great bodily injury or death" (italics added)]; *People* v. *Turner* (1983) 145 Cal.App.3d 658, 684-685 [193 Cal.Rptr. 614] ["A weapon/firearm is 'used' when the defendant *means* to display it in a menacing manner or intentionally to strike at a human being with it"].) If the defendant displays a gun to cow the victim, a use occurs at that moment, even if the victim is not cowed, or turns to run before seeing the gun or

---

[9]"The next question is, whether the robbery and putting in jeopardy the life of the driver was done with dangerous weapons; pistols are such weapons; it is a use of them to point them at another, accompanied with words which denote an intention of injury, or without words, if they are shown and so held as to plainly indicate a design to do so in case of resistance or refusal to consent to the objects intended to be effected by their production and display. *It need not be pointed at the driver, if intended to be used in case of resistance or refusal to surrender the mail; or if it was seen by the driver, and he had reasonable cause for believing it was to be so used . . . .*" (*United States* v. *Wilson, supra,* 28 Fed. at p. 708, italics added.)

realizing it is present.[10] Nor does such a rule cause section 12022.5(a) to subsume the lesser enhancement for being "armed" under section 12022(a). The requirement of gun-related *conduct* coupled with facilitative *intent* amply distinguishes use from mere possession.

## III.

Defendant's brief suggests a further issue, which the parties fail to distinguish from the asserted requirement of knowledge as an element of the enhancement: whether a gun is "used" if the victim escapes the would-be robber before the robber produces the gun. The question is not the victim's mental state as such, but whether a gun has been used "in the commission" of an attempted robbery which, arguably, was terminated by the victim's flight, *before* any gun use occurred.

Intriguing as this issue may be, we need not reach it here, for on any view of the facts necessarily accepted by the jury, the attempted robbery of Wilfredo had not terminated when the gun was "used," and the menacing display of the gun, whether seen by Wilfredo or not, was a use "in the commission" of the ongoing attempt against him.

When Wilfredo turned and fled from the site of the original confrontation he was pursued by defendant's machete-wielding companion. This left Walter and defendant behind. Accepting defendant's view of the evidence, the use of the gun took place during this period. Under these facts, both attempted robberies—that of Wilfredo and that of Walter—continued throughout the time of the gun use. ■ (See *People* v. *Taylor* (1995) 32 Cal.App.4th 578, 582 [38 Cal.Rptr.2d 127], review den. [for purposes of use enhancement, robbery and similar crimes "continue beyond the time of the physical conduct constituting the offense until the perpetrator has reached a place of temporary safety. Accordingly, one who employs a firearm at any time on the continuum between the initial step of the offense and arrival at a place of temporary safety is subject to the enhancement."].)[11]

Of course, under this view of the facts the gun was displayed only to Walter, not to Wilfredo. However, a gun may be used " 'in the commission

---

[10]Indeed we believe a gun use enhancement would be wholly warranted if the defendant deployed a gun to further the holdup of a blind person—even if the victim never learned of the gun's presence. As another court said with respect to the offense of publicly exhibiting a firearm in a rude or offensive manner, "The thrust of the offense is to deter the public exhibition of weapons in a context of potentially volatile confrontations. The victim's unawareness of the weapon does little to mitigate the danger inherent in such situations." (*People* v. *McKinzie* (1986) 179 Cal.App.3d 789, 794 [224 Cal.Rptr. 891], review den.)

[11](Cf. *People* v. *Masbruch* (1996) 13 Cal.4th 1001 [55 Cal.Rptr.2d 760, 920 P.2d 705] [where series of sex offenses was facilitated by initial immobilization following gun display, gun was "used" in each offense].)

of' " a given crime even if the use is directed toward someone other than the victim of that crime. In *People* v. *Fierro, supra,* 1 Cal.4th 173, 225-227, the Supreme Court sustained a use enhancement in connection with a robbery conviction, where the defendant shot and killed the robbery victim's companion after completing the *offense* of robbery by taking property from the victim. Although much of the court's discussion is devoted to the somewhat esoteric question whether the robbery had been "completed" for enhancement purposes when the shooting took place, the decision is relevant here for its recognition of the plain, commonsense meaning of "use" as applicable to gun-related conduct in the facilitation of a crime, even if not directed at the victim. As the court said, "In light of the legislative purpose to discourage the use of firearms, it would appear to be immaterial whether the gun use occurred during the actual taking *or against the actual victim,* so long as it occurred 'in the commission' of the robbery. [Citation.]" (*Id.* at p. 226, italics added.)

This principle, or a narrower corollary of it, has been recognized elsewhere. (See *People* v. *Berry* (1993) 17 Cal.App.4th 332, 335-339 [21 Cal.Rptr.2d 299], and cases cited ["use encompasses a situation where the defendant is armed and uses his firearm in furtherance of a series of related offenses that culminates in a fatal or near fatal shooting even though the defendant does not personally fire the actual shot"].) These cases, like *Fierro,* confirm what common sense suggests: a defendant uses a gun "in the commission" of a crime when he or she employs the gun to neutralize the victim's companions, bystanders, or other persons who might otherwise interfere with the successful completion of the crime.

Again, under the statutory language the test for weapon use is functional, not formulaic. The central question is whether the defendant personally deployed the weapon, or acted as if to do so, in furtherance of the crime. The evidence here was more than sufficient to support the jury's affirmative answer. Even if Wilfredo did not notice the gun, it was deployed to control the conduct of both victims. At the very least, it "effectively glued" Walter to his location (*People* v. *Johnson, supra,* 38 Cal.App.4th 1315, 1321), prevented him from going to Wilfredo's assistance, and thereby aided defendant's machete-wielding partner in the ongoing attempt to rob Wilfredo. On any legally sound construction of the undisputed facts, the jury was highly likely to sustain the use allegations as to both victims.[12]

---

[12]Defendant also contends that the trial court was required to instruct sua sponte on the "lesser included enhancement" of being armed with a firearm under section 12022(a). (See *People* v. *Turner, supra,* 145 Cal.App.3d 658, 683-685.) Assuming the court's failure to do so constituted error, we find it harmless. (See *People* v. *Johnson, supra,* 38 Cal.App.4th 1315,

The judgment is affirmed.

Haerle, Acting P. J., and Hitchens, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied January 15, 1997.

---

1321.) Since the jury obviously believed that defendant displayed the gun, it is extremely unlikely that it would have concluded the display was intended to facilitate the robbery of only one victim. Rather, as we have concluded, once it found that a display occurred, the jury was almost certain to find that this was for the purpose of facilitating, and thus "in the commission" of, both robberies.

*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.