Filed 4/9/21  P. v. Blackman CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H046452 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. F28200) |
| v. | |
| RICHARD GENE BLACKMAN, | |
| Defendant and Appellant. | |

Defendant Richard Gene Blackman robbed a bank and fled in the bank manager's car. His first jury trial resulted in convictions for robbery and carjacking, with no verdict reached on other counts and special allegations, which were retried. The second jury convicted him of simple kidnapping and attempted kidnapping for carjacking; the second jury also found true special allegations that defendant used a firearm during commission of all four conviction offenses. On appeal from an 18-year prison sentence, defendant argues: insufficient evidence supports the firearm use enhancements; the trial court erred by modifying the pattern jury instruction for the firearm use enhancements; the trial court erred by not striking the carjacking conviction as a lesser included offense of attempted kidnapping for carjacking; the trial court improperly considered at sentencing defendant's pretrial refusal to accept plea offers; and his trial counsel provided ineffective assistance by not requesting a mental health diversion hearing (Pen. Code, § 1001.36). For the reasons stated here, we will affirm the judgment.

Defendant's appellate counsel has also filed a petition for writ of habeas corpus alleging ineffective assistance of trial counsel again based on failure to request mental health diversion. We dispose of that petition by separate order filed this day. (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

## I. TRIAL COURT PROCEEDINGS

Defendant was charged by felony information with second degree robbery (Pen. Code, § 211); kidnapping to commit robbery (Pen. Code, § 209, subd. (b)(1)); kidnapping for carjacking (Pen. Code, § 209.5, subd. (a)); and carjacking (Pen. Code, § 215, subd. (a)). (Unspecified statutory references are to the Penal Code.) As to all counts, the information alleged that defendant personally used a firearm. (§ 12022.53, subd. (b).)

The matter proceeded to trial after defendant rejected a plea agreement offered by the prosecution. The jury convicted defendant of robbery and carjacking, but could not reach a verdict regarding the kidnapping counts or the firearm use allegations. The trial court declared a mistrial as to those counts and allegations. The parties were again unable to reach a negotiated disposition, and the matter proceeded to a second trial where the following evidence was presented.

### A. THE BANK ROBBERY

The branch manager for a bank in Capitola testified that she was chatting with her three bank tellers on a Saturday morning just after the bank opened and before any customers had arrived. The manager was standing near the deposit slip kiosk when she noticed a man standing uncomfortably close to her, within her "personal bubble space." (The man was identified at trial as defendant.) Defendant was "in a head to toe yellow ... rain slicker." Defendant told the manager: "I have a gun and I'm here to rob you." He was carrying a green duffel bag, and one of his hands was inside the bag. The manager walked through the locked door back into the teller area. Defendant followed and handed her a plastic bag. Defendant told the manager a second time that he had a

2

gun, and "he acted as if he was widening the bag open as if to show me." The bank manager told defendant: "I'm sure you do. I know you do. You're not going to need to use it." The manager instructed the closest bank teller to step back, and then the manager emptied the contents of the teller's drawer into the plastic bag. The manager tried to hand the plastic bag back to defendant, but he told her he wanted the money from the other drawers as well.

Once the tellers' cash drawers were empty, defendant told the manager he needed "car keys, a car, and a cell phone." The manager led him to her desk, grabbed her keys and wallet, and tried to hand them to defendant. Defendant responded, "no, you're going with me." Defendant moved closer to the manager and then led her outside. He told her: "No sudden movement, no eye contact, no talking." She walked with him to her car, and then repeatedly begged him to just take the car and leave her. Defendant eventually drove away alone. The manager testified that she was terrified throughout the encounter.

Surveillance footage of the robbery was admitted into evidence and played for the jury. Two of the bank tellers also testified, with testimony that was generally consistent with the manager's.

## B. DEFENDANT'S FLIGHT AND ARREST

Based on a 911 call from one of the bank tellers, a deputy sheriff who was on patrol in the area received a "be on the lookout" alert from dispatch. The dispatcher was following the car using a tracker that had been surreptitiously included in the money bag given to defendant. The tracker stopped briefly at the Brommer Street Park and then continued onto Chanticleer Avenue. The deputy drove to Chanticleer and pulled up behind a car parked in front of an elementary school that matched the description of the bank manager's car. Defendant was sitting in the car (still in yellow rain gear). The driver's door of the car opened, and the deputy quickly got out of his patrol car in case defendant attempted to run. Defendant stepped his left foot out of the car, which allowed the deputy to see that defendant was holding a double-barreled shotgun between his legs.

3

The deputy repeatedly ordered defendant to drop the gun. Defendant was making suicidal comments. Defendant got out of the car completely, with his back to the deputy and the gun barrel pointed upward. Defendant set the gun down against the open car door, with the barrel still pointed up. Defendant then let go of the gun entirely as he slowly got down onto his knees. The deputy ran up, grabbed the hood of defendant's jacket, and pulled him back as hard as he could away from the gun. The deputy subdued defendant until backup arrived. The deputy learned later from another officer that the shotgun was loaded. A police officer testified at trial that the shotgun fit inside the duffel bag defendant had carried in the bank.

## C. DEFENSE CASE

A forensic psychologist testified, based on an interview with defendant and review of other information, that defendant was suffering from major depressive disorder when he committed the robbery. The psychologist explained that symptoms of the disorder can include "feeling down, depressed, feelings of helplessness, hopelessness, desperation." According to the expert, the disorder can affect an individual's ability to think rationally, and that it was "possible" as a general matter that the disorder could affect an individual's ability to form specific criminal intent. The defense called multiple character witnesses, who testified to defendant being a helpful, pleasant, and trustworthy person.

Defendant also testified. At the time of the robbery he lived in the Santa Cruz Mountains and his truck was broken. He had run out of money and wanted to go into town to try to collect amounts owed from past plumbing jobs. He packed a green duffel bag with a change of clothes and a double-barreled shotgun, which he explained he needed because "I came down here to collect money from people and some of the people just weren't very nice people." Defendant testified he had sawed off part of the gun barrels about a year before the robbery. He got a ride into Capitola the day before the robbery, and walked to several houses seeking payment. It was raining that day, so he put on the yellow rain suit. At the end of that day he tried unsuccessfully to call his

4

housemate for a ride home. Defendant ended up sleeping behind a hedge near a hardware store.

Defendant testified that early in the morning on the day of the robbery he removed the shotgun from the duffel bag, wrapped it in a towel, and hid it at Brommer Street Park. (Defendant acknowledged on cross-examination that during an interrogation shortly after the robbery he told police he had the shotgun with him during the robbery.) He then walked to the bank and stood under the roof eave to get out of the rain. Once the bank opened, defendant entered and approached the manager. He told her, "I think I'm going to rob your bank." Defendant testified that he did not remember telling the manager he had a gun, and testified that his hand was in the duffel bag to support it because the bag was sliding off his shoulder. Defendant claimed that rather than asking for the car keys, he asked the manager for a ride and she agreed to give him one. But after he and the manager left the bank, "[a]ll of [a] sudden she changed her mind" and did not want to give him a ride. Defendant testified that he tried to give the keys back to the manager because he merely wanted a ride, but he acknowledged he ultimately took the car. Defendant testified that he stopped at Brommer Street Park to pick up his gun and then drove to the elementary school. He testified that he loaded the gun after he stopped at the school because he intended to kill himself.

### D. VERDICT AND SENTENCING

The second jury found defendant guilty of the lesser included offenses of kidnapping (§ 207, subd. (a)) and attempted kidnapping for carjacking (§§ 664, 209.5, subd. (a)). The second jury found true the firearm use allegations as to those convictions and as to the carjacking and robbery convictions from defendant's first trial.

The trial court imposed an 18-year sentence, consisting of a principal term of seven years for attempted kidnapping for carjacking (§§ 664, 209.5, subd. (a)); one year consecutive for robbery (§§ 211; 1170.1, subd. (a)); and 10 years consecutive for the firearm use enhancement related to the attempted kidnapping for carjacking conviction

5

(§ 12022.53, subd. (b)).  Sentences for the other two counts were stayed (§ 654), and no references to sentences for the remaining three firearm use enhancements appear on the operative amended abstract of judgment.

## II.    DISCUSSION

We address defendant's appellate arguments in the following order:  whether the evidence was sufficient to support the firearm use enhancements; whether it was proper to modify the jury instruction on personal firearm use; whether carjacking is a lesser included offense of attempted kidnapping for carjacking; whether the trial court considered improper factors during sentencing; and whether mental health diversion (§ 1001.36) should have been requested and explored.

### A. EVIDENCE SUPPORTING THE FIREARM USE ENHANCEMENT

Defendant argues the evidence was insufficient to find true the allegations that he personally used a firearm during the crimes for which he was convicted.  He contends that, as a matter of law, his conduct did not amount to the personal use of a firearm under section 12022.53.

### 1.  The Firearm Use Enhancement and Standard of Review

The firearm use allegations the second jury found true apply to a person who "personally uses a firearm" in committing certain felonies, which include the four for which defendant was convicted.  (§ 12022.53, subd. (b).)  The same language is used in section 12022.5, subdivision (a), which provides:  "any person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years, unless use of a firearm is an element of that offense."  Those two firearm *use* enhancements are juxtaposed with the *arming* enhancement in section 12022, subdivision (a)(1), which adds a one-year enhancement to the sentence of any "person who is armed with a firearm in the commission of a felony or attempted felony."

6

The Supreme Court has explained the difference between the use and arming enhancements as follows: "By employing the term 'uses' instead of 'while armed' the Legislature requires something more than merely being armed. ([Citation.]) One who is armed with a concealed weapon may have the potential to harm or threaten harm to the victim and those who might attempt to interrupt the commission of the crime or effect an arrest. ([Citation.]) Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies." (*People v. Chambers* (1972) 7 Cal.3d 666, 672 (*Chambers*); accord *People v. Bland* (1995) 10 Cal.4th 991, 997.)

The scope of the section 12022.5 use enhancement—containing the same "personally uses a firearm" language as the section 12022.53 enhancement at issue here—was discussed in *People v. Granado* (1996) 49 Cal.App.4th 317 (*Granado*). Two male victims were walking when they realized they were being followed by Granado and another man. Granado repeatedly demanded money from the victims. Granado's accomplice then blocked the men's path and brandished a machete, while Granado brandished a handgun. One of the victims ran, and it was unclear whether he ever saw Granado's handgun. (*Id.* at p. 320.) Granado and the accomplice fled without obtaining any money when they heard the police approaching. Granado never pointed the gun at either victim, but did hold it in his hand during the attempted robbery. A jury convicted Granado of two counts of attempted robbery (one per victim), and found true two section 12022.5 firearm use enhancements (one per count). (*Granado,* at p. 321.)

Granado argued on appeal that his conduct was insufficient as a matter of law to support the firearm use enhancements because he did not engage in additional behavior (such as pointing the gun at a victim, or threatening to use it) that he argued was necessary to support the firearm use enhancement. (*Granado*, *supra*, 49 Cal.App.4th at p. 322.) In rejecting that argument, the court quoted the California Supreme Court's

7

statement that the " 'obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that "uses" be broadly construed.' " (*Granado*, at p. 322, quoting *Chambers*, *supra*, 7 Cal.3d at p. 672.) The *Granado* court reviewed section 12022.5 and cases applying it, and concluded that "as a matter of plain English and of carrying out the intent" of the statute, "when a defendant deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure." (*Granado*, at p. 325.) The court explained its understanding that section 12022.5 "was intended in significant part to constrain a would-be robber in [Granado's] position to *keep the gun in his waistband*. So long as he did so, he would be subject only to the [shorter] enhancement for being armed. But once he intentionally deployed the gun in furtherance of the offense, he became subject to a use enhancement." (*Granado*, at p. 327.) In affirming the enhancement as to the victim who fled and therefore may not have seen the gun Granado displayed, the court rejected "a rule which would preclude a finding of gun use in an attempted robbery unless the victim were shown to have been aware of the gun's presence" because it is the defendant's conduct in using the firearm that the enhancement punishes. (*Id.* at p. 326.)

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We presume the "existence of every fact that the trier of fact could reasonably deduce from the evidence" to support the judgment. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) To overturn a conviction for insufficient evidence, "it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

## 2. Sufficient Evidence Supported the Enhancement

The parties do not dispute that the relevant evidence, viewed in the light most favorable to the judgment, is as follows: Defendant entered the bank, told the manager he had a gun, and told her he was robbing the bank. He was holding a green duffel bag, and kept one of his hands inside the bag throughout the incident. He told the manager a second time that he had a gun when she was near the tellers, and tried to open the bag "as if to show" the bank manager the gun. There was no evidence that the manager or any of the three tellers ever saw the gun defendant told them he was carrying. After the manager filled the plastic bag with cash, defendant demanded the manager's car keys. He told her she was going with him, and led her outside to the car. Only after she pleaded with him to leave without her did he drive off in the car alone. The manager testified she was terrified throughout the encounter. Defendant was arrested minutes later possessing a loaded shotgun and ammunition.

The foregoing constitutes sufficient evidence to support the firearm use allegations the second jury found true. The jury could infer from the evidence that defendant not only possessed a gun during all four crimes for which he was convicted, but also that his hand was inside the duffel bag to hold the gun and use it to facilitate the crimes. He told the manager he had a gun, and even moved the bag as if to open it to show her the gun. And there is no plausible reason to suggest he was using the gun for "any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense[s]." (*Granado*, *supra*, 49 Cal.App.4th at p. 325.)

Defendant attempts to liken his keeping the shotgun in the duffel bag to keeping it in his waistband, arguing "there is absolutely a distinction between a victim confronted by a gun in the perpetrator's hand and one that is still 'in his waistband,' in this case, in his duffel bag." Had defendant announced he possessed a gun and kept his hands out of the duffel bag, his comparison to a gun in the waistband would be more apt. But the crucial distinction here is that defendant's hand was in the duffel bag the entire time,

9

supporting an inference that the gun was indeed in defendant's hand even if it was obscured from view.  An obscured gun in a defendant's hand is "used" and subject to the same enhancement as a displayed gun, because a gun fired from within a duffel bag is almost certainly as dangerous as a gun fired outside of one.  (*Granado*, *supra*, 49 Cal.App.4th at p. 327 ["It requires no statistical study to know that a gun is far more likely to go off while held in the hand than while resting in a pocket, holster, or waistband."].)  That greater relative risk supports the use enhancement here because rather than merely keeping the gun on his person, defendant intentionally deployed its immediacy to facilitate the offenses.

Defendant cites several firearm use enhancement cases involving more serious conduct to suggest that those cases represent the minimum necessary to support the use enhancement.  (E.g., *People v. Wardell* (2008) 162 Cal.App.4th 1484, 1493 [the defendant "prominently displayed the gun" throughout the false imprisonment offense].)  But those cases are merely examples of other contexts where the firearm use enhancement applied, and they do not purport to establish any threshold conduct required.

Defendant cites other cases to support his position that where the "victim or witness did not actually see the firearm, courts have required ... some sort of sensory perception of the weapon (i.e., auditory, visual, or physical touch)."  (E.g., *People v. Jacobs* (1987) 193 Cal.App.3d 375, 382 [use enhancement affirmed where the defendant announced he had a gun and the victim "heard the sound of the hammer being cocked"].)  But no court has stated a rule that sensory perception is a prerequisite for the firearm use enhancement; the cases defendant cites merely affirmed application of the enhancement in situations where sensory perception was present.  Our conclusion that defendant's conduct was sufficient to satisfy the enhancement is consistent with the California Supreme Court's guidance that the firearm use enhancement should be interpreted broadly to include any "conduct which produces a fear of harm or force by means or

10

display of a firearm in aiding the commission of one of the specified felonies." (*Chambers*, *supra*, 7 Cal.3d at p. 672.) Here, defendant produced fear by announcing the presence of the shotgun he appeared to hold and likely was holding inside the duffel bag, regardless of whether anyone saw the gun or otherwise perceived it.

Defendant also cites cases where no firearm use enhancement was alleged at all, perhaps to suggest that the prosecution in those cases concluded the enhancement would not apply. But a prosecutor's discretionary charging decision in one case has no bearing on a different prosecutor's allegations in a different case.

We conclude there was sufficient evidence to support the jury's findings on the firearm use allegations.

### B. FIREARM USE JURY INSTRUCTION

Defendant contends the trial court erred in modifying the pattern jury instruction for the firearm use allegations (CALCRIM No. 3146) to state that the allegations can be found true even if the firearm is not displayed. Defendant argues the modified instruction misstated the law.

The trial court has a duty to instruct the jury on the elements of charged offenses and special allegations. (*People v. Merritt* (2017) 2 Cal.5th 819, 824.) Use of pattern jury instructions is "strongly encouraged" (Cal. Rules of Court, rule 2.1050(e)), but the trial court's ultimate "obligation is to state the law correctly" for the jury. (*People v. Runnion* (1994) 30 Cal.App.4th 852, 858.) We review instructional error claims de novo, including whether an instruction correctly stated the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

CALCRIM No. 3146 provides, in relevant part: "Someone *personally uses* a firearm if he or she intentionally does any of the following: [¶] 1. Displays the weapon in a menacing manner; [¶] 2. Hits someone with the weapon; [¶] OR [¶] 3. Fires the weapon." Over a defense objection, the trial court granted the prosecutor's request to modify that instruction. The jury was instructed: "Someone *personally uses* a firearm if

11

he or she intentionally does any of the following: [¶] 1. Fires the firearm; [¶] 2. Hits someone with the firearm; [¶] OR [¶] 3. Displays the weapon in a menacing manner. [¶] [The victim] need not have actually seen the firearm for you to find that it was 'Displayed.' However, if [the victim] did not see the firearm, you must find that the defendant: [¶] a) Possessed a firearm; [¶] b) He made the firearm's presence known to [the victim]; [¶] AND [¶] c) The reason he made the firearm's presence known to [the victim] was to intimidate her so that he could successfully complete the underlying offense."

Defendant's position on this point is similar to the sufficiency of the evidence argument we have already addressed. He contends "firearm use allegations require the gun be intentionally fired, used to assault the victim, or displayed under circumstances constituting a threat," or that "where the victim or witness did not actually see the firearm, courts have required some sort of sensory perception of the weapon." But no court has ever adopted defendant's proposed sensory perception test as a necessary prerequisite for the enhancement to apply.

The language in the modified instruction was taken from *Granado*, where the court stated: "when a defendant deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure." (*Granado*, *supra*, 49 Cal.App.4th at p. 325.) Defendant argues the "language pulled from *Granado* was highly selective and did not encompass the entirety of the holding" in that case. We find the language from *Granado* neither selective nor incomplete. *Granado* affirmed application of a firearm use enhancement as to each of the two victims, even though one of them may have fled before Granado brandished the weapon. (*Id.* at pp. 321, 326.)

12

Defendant interprets *Granado* as holding "that personal use does not happen when the defendant keeps the weapon concealed." However, the distinction made in *Granado* was not between a concealed versus openly carried weapon, but rather between a holstered weapon and one being actively used. The *Granado* court reasoned that a gun kept in a defendant's *waistband* would likely support only an arming enhancement and not a firearm use enhancement. (*Granado*, *supra*, 49 Cal.App.4th at p. 326–327.) But when a defendant either "deliberately shows a gun, *or otherwise makes its presence known*," the firearm use enhancement is appropriate. (*Id.* at p. 325, italics added.)

We conclude that the modified instruction correctly stated the law.

## C. CARJACKING AS A LESSER INCLUDED OFFENSE

Defendant contends that carjacking is a lesser included offense of attempted kidnapping for carjacking such that his carjacking conviction must be reversed and dismissed.

### 1. Legal Standards

A jury may convict a defendant of "any offense, the commission of which is necessarily included in that with which he is charged." (§ 1159.) But a defendant cannot be convicted of both a greater offense and a lesser included offense arising from the same facts. (See *People v. Reed* (2006) 38 Cal.4th 1224, 1227 ["A judicially created exception to the general rule permitting multiple conviction 'prohibits multiple convictions based on necessarily included offenses.' "].) " '[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.' " (*People v. Smith* (2013) 57 Cal.4th 232, 240.) "The evidence adduced at trial is not to be considered in determining whether one offense necessarily is included within another." (*People v. Cheaves* (2003) 113 Cal.App.4th 445, 454 (*Cheaves*).) We exercise our independent

13

judgment to determine whether an offense is necessarily included in another offense. (*People v. Braslaw* (2015) 233 Cal.App.4th 1239, 1247.)

The parties agree that *People v. Medina* (2007) 41 Cal.4th 685 (*Medina*) is relevant, if not controlling. Medina was convicted of, among other things, attempted kidnapping for carjacking and attempted carjacking. (*Id.* at p. 691.) Medina argued in the Court of Appeal that "his convictions for attempted kidnapping during commission of a carjacking (§§ 664, 209.5[, subd.] (a)) must be reversed because the offense requires a *completed* carjacking for which there was insufficient evidence." (*Medina*, at p. 691.) The Supreme Court granted review to decide two issues, only one of which is relevant here: whether a completed carjacking is prerequisite to an attempted kidnapping for carjacking conviction. (*Id.* at p. 690.) The court noted generally that an attempt requires the specific intent to commit the target crime plus a direct but ineffectual act toward its completion. Therefore a kidnapping for carjacking conviction requires both a completed kidnapping and a completed carjacking. (*Id.* at pp. 693–694.) But an *attempted* kidnapping for carjacking requires only the specific intent to commit both a kidnapping and a carjacking coupled with direct but ineffectual acts toward those crimes. "[N]either a completed kidnapping nor a completed carjacking is necessary for an attempted kidnapping during the commission of a carjacking." (*Id.* at pp. 694–695.) The court rejected Medina's argument that kidnapping for carjacking was a " 'species of kidnapping in which the completed commission of a carjacking provides the context,' " reasoning that there was no indication the Legislature intended to remove kidnapping for carjacking from "the ambit of the general attempt statutes." (*Id.* at p. 696.)

### 2. Carjacking is Not a Lesser Included Offense of Attempted Kidnapping for Carjacking

Defendant's argument that his carjacking conviction must be reversed is foreclosed by the reasoning in *Medina*, which determined that "neither a completed kidnapping nor a completed carjacking is necessary for an attempted kidnapping during

the commission of a carjacking." (*Medina*, *supra*, 41 Cal.4th at p. 695.)   The same conclusion results after applying the statutory elements test here.[1]  Consistent with the *Medina* court's analysis, an attempted kidnapping for carjacking can be committed without committing a completed carjacking, and a completed carjacking is therefore not a lesser included offense of attempted kidnapping for carjacking.

Defendant tries to avoid this result with two main arguments.  First, defendant argues that *Medina* merely determined that a completed carjacking is not a prerequisite for attempted kidnapping for carjacking and did not expressly hold that carjacking is not a lesser included offense of attempted kidnapping for carjacking.  The *Medina* court addressed the "prerequisite" issue in response to Medina's argument that there was insufficient evidence to support his attempted kidnapping for carjacking conviction because the jury found that he had committed only an *attempted* carjacking.  (*Medina*, *supra*, 41 Cal.4th at pp. 690–691.)  But that is a distinction without a difference because the *Medina* court's legal analysis is the same as the lesser included offense analysis we must apply here.  Defendant also notes that *Medina* did not overrule *People v. Jones* (1999) 75 Cal.App.4th 616 (*Jones*), which defendant claims "held [that] a completed carjacking is a lesser included offense of attempted kidnapping for carjacking."  But that was not the holding in *Jones*.  *Jones* reversed a *completed* kidnapping for carjacking conviction because there was insufficient evidence to find that the defendant had committed a completed carjacking.  (*Jones*, at pp. 624–625.)  In a footnote related to a different point, the *Jones* court noted in dictum that because neither party argued that one of the convictions should be reduced to attempted kidnapping for carjacking, the court did not need to "decide whether such a crime exists, although if it does, under the language of section 209.5, it appears a completed carjacking would be a requirement."

---

[1]  We focus on the statutory elements test because defendant points to no facts in the accusatory pleading that differ from the statutory elements for the offenses at issue here.

15

(*Jones*, at p. 627, fn. 3.) That *Jones* dictum was impliedly disapproved through the *Medina* court's conclusion.

Second, defendant argues the *Medina* analysis "fails in this particular case because [defendant] was, in fact, found guilty of having committed [a] carjacking (count 4) in his first jury trial." Indeed, defendant was convicted of carjacking in the first trial and the second jury was so instructed. But that prior conviction is irrelevant to the analysis of a lesser included offense because the "evidence adduced at trial is not to be considered in determining whether one offense necessarily is included within another." (*Cheaves*, *supra*, 113 Cal.App.4th at p. 454.) The tests for determining whether one offense is necessarily included within another—the statutory elements and accusatory pleading tests—look at the offenses objectively without regard to what occurred at trial. Because attempted kidnapping for carjacking can be completed without committing a completed carjacking, carjacking is not a lesser included offense regardless of the facts adduced at defendant's trials. The trial court did not err in staying sentence for the carjacking conviction under section 654, rather than dismissing it as a lesser included offense.

### D. PLEA NEGOTIATIONS AND SENTENCING

Defendant argues the judgment must be reversed and remanded for resentencing because the trial court improperly considered defendant's refusals to accept negotiated dispositions offered by the prosecution. A trial court violates a defendant's federal constitutional right to due process if the defendant's earlier refusal to accept a plea agreement influences the sentence imposed after trial. (*In re Lewallen* (1979) 23 Cal.3d 274, 279 (*Lewallen*).) "That a defendant pleads not guilty is completely irrelevant at sentencing; if a judge bases a sentence, or any aspect thereof, on the fact that such a plea is entered, error has been committed and the sentence cannot stand." (*Ibid.*)

#### 1. Background

A few days before defendant's first trial, the trial court informed defendant that if "you're convicted of all of these charges, you'll spend the rest of your life in prison"

16

because defendant was already 65 years old. The court encouraged defendant to consider a plea agreement if one was offered by the prosecution. The minute order for the first day of the first trial indicates defendant rejected a plea offer that would have included a 15-year prison sentence.

Following defendant's convictions for carjacking and robbery in the first trial, the prosecution apparently offered defendant a 10-year prison sentence as part of a negotiated disposition. Defendant rejected that offer as well, leading to the second trial where the jury convicted him of the two kidnapping-related counts and found true the firearm use enhancements.

Defendant proposed a six-year sentence to the court. The probation department recommended a 10-year sentence, consisting of nine years for attempted kidnapping for carjacking (§§ 664, 209.5, subd. (a)), one year consecutive for robbery (§§ 211; 1170.1, subd. (a)), and no additional time for the firearm use enhancements. The prosecutor requested the 18-year sentence that the trial court ultimately imposed.

At the sentencing hearing, the trial court described in detail its participation in efforts to resolve the case by negotiated disposition: "Way back when we started talking about the case, I became somewhat more involved than I typically do in cases because I saw that this is a case that in the very end, if we didn't resolve it, you were looking at a very long prison sentence, and no criminal history, in your 60's. And I really pushed the attorneys to look at the case and try [to] come up with some resolution that you both could live with. And the DA was sticking pretty firm for awhile and wasn't going to go down much. And your attorney was, based on you telling her what to do, at a pretty low point. [¶] At some point I got you at a middle point that I thought was going to resolve the case and both sides agreed with it. And then it didn't resolve. [¶] And then we had one trial, we tried it again and you all talked a lot about the case and again came up with what I thought was a pretty fair place to be without having to go to trial again. And you

17

rejected it, you said, no, you didn't want the DA's offer. And now we go to trial twice and the jury didn't believe you."

Turning to defendant's and the probation department's request that the court stay or strike the sentence for the firearm use enhancement, the trial court reasoned that although defendant had performed well in custody, "for me to look at this case and say you carried a loaded shotgun into a bank and terrified these individuals and I can just say there's no sentence for the shotgun, that's a tough one to swallow." The court continued: "[Y]ou absolutely went in there with a shotgun and you terrified this woman and she thought she was being kidnapped and you went through those steps of taking her that distance."

### 2. Analysis

Defendant's argument can be distilled to two contentions: the trial court's behavior here is factually similar to that of the trial court in *Lewallen* requiring reversal of the judgment; and "no facts were developed at trial which would have warranted a longer sentence than the 10 year plea offer." Neither contention is persuasive.

Lewallen was charged with misdemeanor driving under the influence of alcohol as well as three misdemeanor firearm possession counts. (*Lewallen*, *supra*, 23 Cal.3d at p. 276.) Lewallen pleaded not guilty, and informed the prosecution he would refuse any plea agreement that did not involve dismissing the firearm counts. A jury convicted Lewallen of drunk driving, and acquitted him of the firearm counts. (*Ibid.*) At sentencing, "in response to defense counsel's suggestion that placing defendant on informal probation would suffice, the trial judge responded, 'You mean whether or not there's a disposition or not after a jury trial?' " (*Id.* at p. 277.) The trial court also stated: " '[A]s far as I'm concerned, if a defendant wants a jury trial and he's convicted, he's not going to be penalized with that, but on the other hand he's not going to have the consideration he would have had if there was a plea.' " (*Ibid.*) In granting habeas relief following the trial court's imposition of formal probation, the Supreme Court reasoned

18

that the "trial judge's rhetorical query at sentencing --'You mean whether or not there's a disposition or not after a jury trial?' -- clearly reveals that he gave consideration to petitioner's election to plead not guilty in imposing sentence." (*Id.* at p. 279.) While the *Lewallen* court determined that a sentence cannot stand "if a judge bases a sentence, or any aspect thereof, on the fact that such a plea is entered," it also made clear that "under appropriate circumstances a defendant may receive a more severe sentence following trial than he would have received had he pleaded guilty; the trial itself may reveal more adverse information about him than was previously known." (*Id.* at pp. 279, 281.)

Unlike the trial court in *Lewallen* that expressly considered the defendant's refusal to accept a plea agreement, here the trial court described its frustration and perhaps even regret about defendant's refusal to accept earlier plea offers before the second jury found true the firearm use allegations. Contrary to defendant's contention that no facts were developed at trial to warrant a longer sentence than the 10-year plea deal offered before the second trial, the second jury found true the firearm use allegations which carry a 10-year sentence in and of themselves. The second jury's true findings as to the firearm use allegations substantially changed the severity of defendant's conduct. As the trial court reasoned, "you absolutely went in there with a shotgun and you terrified this woman and she thought she was being kidnapped and you went through those steps of taking her that distance." The use of a firearm is an acceptable aggravating circumstance (Cal. Rules of Court, rule 4.421(a)(2)). On this record, the trial court's statements about plea negotiations did not amount to *Lewallen* error.

E. **MENTAL HEALTH DIVERSION (PEN. CODE, § 1001.36)**

Section 1001.36 allows for pretrial diversion for individuals diagnosed with qualifying mental disorders including, among other things, major depressive disorder. To qualify for diversion, a court must find that a defendant meets six criteria: the defendant suffers from a qualifying mental disorder; the disorder played a significant role in the commission of the charged offense; a qualified expert has opined that the defendant's

symptoms are treatable; the defendant has consented to diversion and has waived his or her right to a speedy trial; the defendant agrees to treatment as a condition of diversion; and the defendant does not pose an unreasonable risk of danger to public safety. (§ 1001.36, subd. (b)(1)(A)–(b)(1)(F).)  In *People v. Frahs* (2020) 9 Cal.5th 618, 625, the Supreme Court concluded that the mental health diversion statute applies retroactively to cases in which the judgment is not yet final under the reasoning of *In re Estrada* (1965) 63 Cal.2d 740, and that the proper remedy for a non-final judgment pending on appeal is to conditionally reverse the judgment and remand the matter for a diversion hearing.

Defendant argues we should conditionally reverse the judgment and remand the matter to the trial court with directions to conduct a mental health diversion eligibility hearing.  Section 1001.36 took effect in June 2018, between defendant's two trials (which occurred in February and August 2018).  (Stats. 2018, ch. 34, § 24.)  Defendant acknowledges he never requested a diversion eligibility hearing.  He urges us not to find the claim forfeited, however, because the law was unsettled at the time of his second trial and the rationale behind forfeiture does not apply here.  Alternatively, he argues if the claim is forfeited his trial counsel was ineffective for not requesting diversion.

The forfeiture rule exists to encourage parties to raise and resolve issues in the trial court.  (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264.)  Defendant forfeited the mental health diversion argument by failing to request diversion in the trial court.  The law took effect more than a month before the second trial started, and the rationale behind forfeiture applies here because requesting diversion before the second trial could have saved considerable resources by potentially eliminating the need for a second trial (had the trial court found diversion appropriate).  We will therefore review the issue to determine whether trial counsel's performance was prejudicially deficient.

To establish ineffectiveness of trial counsel in violation of the right to counsel under the Sixth Amendment to the United States Constitution, a defendant must show both that counsel's performance was deficient and a prejudicial effect of the deficiency.

20

(*People v. Ledesma* (1987) 43 Cal.3d 171, 216–217.)  To prove prejudice, a defendant must affirmatively show a reasonable probability that, but for trial counsel's errors, the result would have been different.  (*Id.* at pp. 217–218.)  We "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."  (*Strickland v. Washington* (1984) 466 U.S. 668, 697.)

It is undisputed defendant was suffering from a qualifying mental disorder (major depressive disorder).  We therefore focus on whether there is a reasonable probability the trial court would have determined "defendant's mental disorder was a significant factor in the commission of the charged offense" (§ 1001.36, subd. (b)(1)(B)) in that it "substantially contributed to [] defendant's involvement in the commission of the offense."  (*Ibid.*)

Defendant argues that desperation was his motive for robbing the bank, and that his desperation was a symptom of major depressive disorder.  He urges that the disorder therefore substantially contributed to his involvement in the charged offenses.  But defendant's desperation can be attributed to multiple factors other than a mental disorder, including lack of money for rent and lack of a functioning automobile.  We acknowledge it may have contributed to the crimes in some way.  We also acknowledge the trial court's comments at sentencing describing its involvement in the parties' attempts to resolve the case, both before and after defendant's first trial.  But the court's stated concern about defendant's exposure to "a very long prison sentence" in light of his advanced age has no bearing on how the court would likely view the relationship of major depressive disorder to defendant's criminal conduct.  On this record, we are not persuaded it is reasonably probable that the trial court would have found the disorder *substantially* contributed to defendant's offenses.  Defendant has not demonstrated prejudice from any deficient performance by his trial counsel.

## III.    DISPOSITION

The judgment is affirmed.

_____

Grover, J.

**WE CONCUR:**

_____

Greenwood, P. J.

_____

Bamattre-Manoukian, J.

**H046452 -** *The People v. Blackman*